UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE DAVIS,

        Plaintiff,

                                  CASE NO. 07-CV-11740-DT
                                  JUDGE DENISE PAGE HOOD
                                  MAGISTRATE JUDGE PAUL J. KOMIVES

    v.

PATRICIA CARUSO, ROBERT M. WESTWOOD,
GERALD COVERT, THERESA MERLING,
BETH GARDON, CONNIE IVES,
PEGGY LEE, SHERRY BURT,
LARRY MCMILLAN, DEBBIE ROTH,
BETTY GLASPER, CHRISTINA PEREZ,
MICHAEL STUPAREK, DAVID KOMJATHY,
AUDBERTO ANTONINI and
CORRECTIONAL MEDICAL SERVICE,

        Defendants.

_____/

**REPORT AND RECOMMENDATION REGARDING MDOC DEFENDANTS' MOTION
TO DISMISS AND/OR SUMMARY JUDGMENT (Doc. Ent. 37) and PLAINTIFF'S
MOTION FOR VOLUNTARY DISMISSAL OF PEREZ (Doc. Ent. 60)**
Table of Contents

I.       RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      A.     Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
      B.     Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order . . . . . . . . . . . 3
      C.     Pending Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      D.     The Instant Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
      E.     Fed. R. Civ. P. 56 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
      F.     Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
           1.     The claims against Covert and Merling are unexhausted. . . . . . . . . . . . . . . . . . . . . . . . 9
           2.     Some of the claims against Ives should be dismissed, and the claims against Gardon and
                 Lee should be dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
           3.     Some of the claims against Burt, McMillan, Stuparek, Roth and Perez should be dismissed.
                 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
           4.     The claims against Caruso should be dismissed. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67
           5.     Defendant Perez should be dismissed with prejudice. . . . . . . . . . . . . . . . . . . . . . . . . . 68

III.    NOTICE TO PARTIES REGARDING OBJECTIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 71

**I.    RECOMMENDATION:**  The Court should grant in part and deny in part the MDOC

defendants' November 29, 2007 motion for dismissal and/or summary judgment.  Doc. Ent. 37.  The

claims filed against defendants Covert and Merling have not been exhausted and should be

dismissed.  Defendants Gardon, Lee, Burt and Stuparek are entitled to summary judgment on all the

claims asserted against them.  Defendants Ives, McMillan and Roth are entitled to summary

judgment with regard to some but not all of the claims asserted against them.  The Court should

dismiss the claims alleged with regard to defendant Caruso, because plaintiff's complaint fails to

state a claim on which relief may be granted.

Furthermore, the Court should grant plaintiff's motion to voluntarily dismiss defendant Perez

(Doc. Ent. 60) but in addition grant the defense request to make this a dismissal with prejudice.[1]

**II.    REPORT:**

**A.    Background [2]**

On April 19, 2007, while incarcerated at Southern Michigan Correctional Facility (JMF),

plaintiff filed this 154-paragraph, verified, pro se prisoner civil rights complaint against sixteen (16)

defendants.  Section I of the complaint (¶¶ 1-25) concerns Chippewa Correctional Facility (URF);

Section II of the complaint (¶¶ 26-101) concerns Cotton Correctional Facility (JCF); and Section

III of the complaint (¶¶ 102-154) concerns Southern Michigan Correctional Facility (JMF).

---

[1]Plaintiff's March 13, 2008 filing states in total, "[m]otion for voluntary dismissal of
defendant Christina Perez, bifurcated with motion to treat verified complaint w/attachments as
affidavit in support of enclosed response to defendants' motion for summary judgment."  Doc. Ent.
60.

[2]Plaintiff was also a party to Western District of Michigan Case Nos. 2:96-CV-00210-RHB-
TPG, *Davis v. Ulep, et al.*; 1:03-CV-00307-RJB-JGS, *Davis v. Caruso, et al.*; and 1:04-CV-00058-
WAM-ESC, *Davis v. Caruso, et al.*  He is also a party to Case No. 4:92-CV-00110-RJJ, *Hadix, et
al. v. Caruso, et al.*

Plaintiff's complaint is based upon the Eighth Amendment deliberate indifference to a serious medical need and First Amendment access to courts and retaliation. He seeks compensatory damages, punitive damages and injunctive relief. Doc. Ent. 1 at 5.

Plaintiff is currently incarcerated at Muskegon Correctional Facility (MCF).[3] Judge Hood has referred this case to me to conduct pretrial matters. The Attorney General has filed an appearance on behalf of twelve (12) defendants: Caruso, Covert, Merling, Gardon, Ives, Lee, Burt, McMillan, Roth, Perez, Stuparek and Glasper. Doc. Entries 12, 32, 50. Appearances have also been filed on behalf of Westwood, Antonini and CMS. Doc. Entries 74 and 75. It appears that David Komjathy has not been served with this lawsuit. Doc. Entries 21, 33.[4]

**B.     Plaintiff's Motion for Preliminary Injunction and Temporary Restraining Order**

On April 19, 2007, plaintiff filed a motion for preliminary injunction and temporary restraining order. Doc. Ent. 3. On July 9, 2007, plaintiff filed a motion for court order requiring JMF in particular and MDOC in general to cease interfering/impeding plaintiff's access to his legal property and his access to the courts by not forcing him to write a grievance to send out legal mail. Doc. Ent. 8.

On March 4, 2008, I entered a report and recommendation on plaintiff's motions for injunctive relief. Doc. Ent. 55. Specifically, I recommended that the Court deny plaintiff's motion for a preliminary injunction and deny plaintiff's motion for a court order requiring defendants to cease interfering with his access to the courts. Doc. Ent. 55 at 1. On March 28, 2008, Judge Hood

_____

[3]*See* www.michigan.gov/corrections, "Offender Search."

[4]According to plaintiff's complaint, Komjathy is contracted by CMS. Doc. Ent. 1 at 2. On January 9, 2008, I entered an order requiring plaintiff to provide current addresses for Westwood, Komjathy and Antonini. Doc. Ent. 46. On March 31, 2008, plaintiff provided the Court with an address for CMS, Antonini, Komjathy and Westwood. Doc. Ent. 66.

entered an order adopting my report and recommendation, denying plaintiff's motion for injunctive relief, and denying plaintiff's motion for order requiring defendants to cease interfering with his access to the courts. Doc. Ent. 65.

## C. Pending Motions

Pending before the Court are several motions: the MDOC defendants' motion for dismissal and/or summary judgment (Doc. Ent. 37);[5] plaintiff's motion to appoint counsel (Doc. Ent. 52); plaintiff's motion for leave to file supplemental complaint (Doc. Ent. 53); plaintiff's motion for preliminary injunction (Doc. Ent. 54); plaintiff's motion to amend/correct complaint (Doc. Ent. 59); plaintiff's motion to dismiss (Doc. Ent. 60); Glasper's motion for summary judgment (Doc. Ent. 72); the CMS defendants' motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) (Doc. Ent. 76); and Antonini and Westwood's motion to access plaintiff's complete medical records (Doc. Ent. 82).

## D. The Instant Motion

The MDOC defendants' November 29, 2007 motion for dismissal and/or summary judgment raises the following arguments:

I. The claims against Defendants Covert and Merling were not exhausted, and Defendants Covert and Merling did not act with deliberate indifference to a serious medical need in June or July 2004. . . . [T]he Court [should] dismiss Plaintiff's claims against these defendants[.]

II. Defendants Gardon and Lee had no involvement in the matters alleged in the complaint except as grievance reviewers. The evidence does not support a finding that Defendants Ives, Gardon or Lee acted with deliberate indifference. . . . Defendants Ives, Gardon, and Lee [are] entitled to summary judgment and qualified immunity[.]

---

[5]This motion was filed before an appearance was entered on Glasper's behalf. Therefore, it was filed only on behalf of eleven (11) of the twelve (12) MDOC defendants.

III.    Defendants Burt, McMillan, Stuparek, and Roth either processed or
        responded to grievances, or to other correspondence. They were not
        involved in Plaintiff's medical care or treatment. Defendant Perez was not
        working on the days that Plaintiff alleges his MS-Contin[6] was missing, and
        Plaintiff's accusations that Perez stole his narcotic medication are purely
        conjecture and speculation. . . . Defendants Burt, McMillan, Stuparek, Roth
        and Perez [are] entitled to summary judgment and qualified immunity due to
        their lack of personal involvement in the matters alleged, and because there
        is no genuine issue of material fact regarding their liability[.]

Doc. Ent. 37 at 4. Attached to this motion are Exhibits A-H. Doc. Ent. 37-2.

On March 13, 2008, plaintiff filed several items. First, he filed a response to defendants'
motion. Doc. Ent. 56. Attached to plaintiff's response is the July 7, 2004 "First Report on Medical
Services" by Robert L. Cohen, MD. Doc. Ent. 56 at 13-18. Second, he filed a two-page document
citing case law on Eighth Amendment deliberate indifference. Doc. Ent. 57. Third, he filed a first
amended complaint. Doc. Ent. 58.[7] Fourth, he filed a motion to amend his complaint. Doc. Ent.
59. Finally, he filed a motion for voluntary dismissal of Perez. Doc. Ent. 60.[8]

Defendants filed a reply to the response on April 22, 2008. Doc. Ent. 69.

**E.      Fed. R. Civ. P. 56**

---

[6]MS Contin are "slow release tablets of morphine sulfate . . . for lasting relief of moderate
to severe pain[.]" SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, M-264 (1995).

[7]The amended complaint adds parties (¶¶ 155-158) and supplemental events and occurrences,
beginning with his July 25, 2007 transfer from JMF to JCF and his July 27, 2007 transfer from JCF
to the Gus Harrison Correctional Facility (ARF). Doc. Ent. 58 at 2-10.

[8]Within this motion, he asks the Court to "treat [his] verified complaint w/attachments as [an]
affidavit in support of [the] enclosed response to defendants' motion for summary judgment." Doc.
Ent. 60. Because plaintiff's March 13, 2008 first amended complaint (Doc. Ent. 58) is eleven (11)
pages in length with no attachments, the Court assumes that plaintiff's request concerns the
originally filed complaint and its attachments. The April 19, 2007 verified complaint and its
attachments have been considered in drafting this report and recommendation.

Summary judgment, pursuant to Fed. R. Civ. P. 56, may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of [the] essential elements of a cause of action or defense asserted by the parties, and would necessarily affect [the] application of appropriate principle[s] of law to the rights and obligations of the parties.

*Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (citing *Johnson v. Soulis,* 542 P.2d 867, 872 (Wyo. 1975) (quoting BLACK'S LAW DICTIONARY 881 (6th ed.1979)). "In evaluating a motion for summary judgment we view all evidence in the light most favorable to Plaintiff . . . and assess the proof to determine whether there is a genuine need for trial." *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1045 (6th Cir. 1998) (citations omitted).[9]

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 861 (6th Cir. 1986). The moving party need not produce evidence showing the absence of a genuine issue of material fact. Rather, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Once the moving party discharges that burden, the burden shifts to the non-moving party to set forth specific facts showing a genuine triable issue. Fed. R. Civ. P. 56(e); *Gregg*, 801 F.2d at 861.

---

[9]The Sixth Circuit cited both *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) and *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) in support of this statement.

"Although the nonmoving party 'may not rest upon the mere allegations or denials' of his pleading, Fed. R. Civ. P. 56(e), a verified complaint . . . satisfies the burden of the nonmovant to respond." *Thaddeus-X v. Blatter*, 175 F.3d 378, 385 (6th Cir. 1999).[10]  "[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issues of material fact." *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992).  However, "[s]upporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Fed. R. Civ. P. 56(e).  *See also Hamilton v. Roberts*, No. 97-1696, 1998 WL 639158, *5 (6th Cir. Sept. 10, 1998) (unpublished) (personal knowledge required); *Daniel v. Cox*, No. 96-5283, 1997 WL 234615, *2 (6th Cir. May 6, 1997) (unpublished) (conclusory assertions are insufficient for purposes of surviving summary judgment); *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994) (citing *Daily Press, Inc. v. United Press Int'l*, 412 F.2d 126, 133 (6th Cir. 1969)) (cannot consider hearsay evidence).

"Demonstration of simply 'metaphysical doubt as to the material facts' is insufficient." *Kand Medical, Inc. v. Freund Medical Products, Inc.*, 963 F.2d 125, 127 (6th Cir. 1992), citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986),  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 246-250 (citations omitted); *see Celotex Corp.*, 477 U.S.

---

[10]Plaintiff signed his complaint under penalty of perjury.  *See* Doc. Ent. 1-4 at 31; 25 U.S.C. § 1746 ("Unsworn declarations under penalty of perjury").

at 322-23; *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-587 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Fed. R. Civ. P. 50(a). *Anderson*, 477 U.S. at 250. Consequently, a non-movant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

## F.     Analysis

This report sets forth recommendations with regard to eleven (11) of the sixteen (16) defendants in this case. The following is a summary of the conclusions I reach in this section. First, the Court should agree with the defendants' counsel that the claims plaintiff has brought against defendants Covert and Merling were not exhausted and dismiss the claims, and these two defendants, from this case. *See* Section II.F.1.

Second, the Court should conclude that defendants Lee and Gardon are entitled to summary judgment on all the claims that have been filed against them. *See* Section II.F.2.d. Defendant Ives is entitled to summary judgment only with regard to plaintiff's claims that she improperly diagnosed his condition on November 18, 2004 and plaintiff's claim based upon her response to grievance JCF-0419. She is not entitled to summary judgment on plaintiff's claim that she improperly documented or failed to document items for his medical record. *See* Section II.F.2.e.

Third, defendants Burt and Stuparek are entitled to receive summary judgment with regard to all of the claims asserted by plaintiff against them because there is no genuine issue of fact that these defendants were not involved in plaintiff's medical care or treatment. *See* Sections II.F.3.h and II.F.3.e. Plaintiff may not seek to hold Burt liable to him on the basis of supervisory liability. *See* Section II.F.3.h. Defendant McMillan is entitled to summary judgment with regard to some, but not all, of the claims asserted by plaintiff. He is entitled to summary judgment with regard to the

claim involving his February 23, 2006 rejection of plaintiff's February 18, 2006 grievance.  He is not entitled to summary judgment with regard to his alleged failure to provide Step II grievance forms for JMF-00736, JMF-00737, JMF-00771, JMF-00772 and JMF-00773 (Compl. ¶¶ 118, 119, 123, 124 and 131).  Nor is defendant McMillan entitled to summary judgment on the claim that he was responsible for the apparently delayed reprocessing of plaintiff's direct Step III grievance which was originally dated May 17, 2006 and ultimately became JMF-01849 on September 21, 2006.  *See* Section II.F.3.d.  Defendant Roth is entitled to summary judgment only to the extent plaintiff seeks to impose liability on the basis of personal involvement due to supervisory duties.  However, defendant Roth is not entitled to summary judgment on plaintiff's claim based on alleged interference with his oncologists' prescriptions for pain medication and failure to ensure that plaintiff received these medications and was allowed to obtain his prescribed chemotherapy medication.  *See* Section II.F.3.f.

Fourth, defendant Caruso is entitled to dismissal as plaintiff may not seek to hold her responsible on the basis of her supervisory duties as Director of the Michigan Department of Corrections, and he has not alleged any personal involvement in regard to the allegations underlying his complaint.  *See* Section II.F.4.  Fifth, the claims against defendant Perez should be dismissed with prejudice.  *See* Section II.F.5.

**1.      The claims against Covert and Merling are unexhausted.**

Plaintiff identifies Covert and Merling as URF registered nurses.  Doc. Ent. 1 at 2.  Section I of the complaint (¶¶ 1-25) concerns Chippewa Correctional Facility (URF).  This portion of the complaint begins with plaintiff's April 7, 2004 transfer from St. Louis Correctional Facility (SLF)

to URF and appears to conclude with a July 7, 2004 visit to Foote Hospital. Doc. Ent. 1 ¶¶ 1, 25.[11]
Plaintiffs saw Covert and Merling on June 15, 2004. Doc. Ent. 1 ¶¶ 6-7. 11, 13

Defendants argue that the claims against Covert and Merling should be dismissed, because "[t]he claims against them were not exhausted, and Defendants Merling and Covert did not act with deliberate indifference to a serious medical need in June or July 2004." Doc. Ent. 37 at 9-11. In his October 11, 2007 affidavit, Gerald Covert states, "I assessed the plaintiff at the [URF] on June 15, 2004 for a complaint of mid sternal burning with gas, belching and heart burn for approximately three to five days. The patient was given Mylanta at the beginning of the exam. By the conclusion of the exam patient stated pain had been resolved." Doc. Ent. 37-3 at 2 ¶ 3. In an October 19, 2007 affidavit, Theresa Merling states, "I assessed the plaintiff at the [URF] on July 3, 2004 for a complaint of flank pain. I immediately made a call to the Duane Waters Hospital and spoke to a Physician who ordered Ultram for the pain. I also scheduled him to be seen by the Physician on July 6, 2004." Doc. Ent. 37-4 at 2 ¶ 3.

The Court should first consider whether plaintiff's claims against Covert and Merling have been exhausted under 42 U.S.C. § 1997e(a). According to a grievance inquiry submitted by defendants, three URF grievances have been appealed to Step III: URF-2004-05-911-12d2 (dated May 11, 2004 and received at Step III on June 28, 2004); URF-2004-05-1045-14z (dated May 26, 2004 and received at Step III on July 6, 2004); and URF-2004-06-1121-28a (dated June 8, 2004 and received at Step III July 6, 2004). Doc. Ent. 37-5.

Attached to plaintiff's complaint are two URF grievances: (1) URF-04-05-0911-12z (Doc. Ent. 1 at 7-11) and (2) URF-04-06-1204-12e (Doc. Ent. 1 at 14-18). Based upon the June 15, 2004

---

[11]The transition from ¶ 25 to ¶ 26 is not fluid. Doc. Ent. 1 at 20-21.

date underlying plaintiff's complaint against Covert and Merling, the Court should look to grievance URF-04-06-1204-12e, dated June 15, 2004, to determine whether plaintiff's claims against these two defendants have been exhausted. The Step I grievance is based upon an incident of the same date. On June 23, 2004, Merling responded to the grievance and Melissa LaPlant reviewed the grievance. In addition to noting that plaintiff refused an interview,[12] Merling responded:

> Investigation at Step I reveals that the patient was evaluated by RN Covert for an unscheduled complaint of chest pain on June 15, 2004. The evaluation resulting in normal findings for a chest pain complaint and it was discussed that the pain could be a result of his diagnosis of GERD.[13] He was given instruction on self care and also referred to the Medical Service Provider whom he saw on June 17, 2004. The patient's race has no relevance in this evaluation or any other. The patient is receiving appropriate care.

Plaintiff completed a Step II grievance appeal on June 19, 2005. On July 11, 2005, Michelle Horton responded. It appears that plaintiff completed a Step III grievance appeal; however, plaintiff has not provided a copy of the Step III grievance response, and defendants' chart of URF grievances which have been appealed to Step III does not include URF-1204.

Plaintiff's response to the motion for summary judgment states that "[i]t is clear from the date of the 2nd Step Response . . . that the Step III could not have showed up before the 2nd Step was answered. Therefore, claims against defendants' Covert and Merling were exhausted." Doc. Ent. 56 at 1-2. However, as defendants point out in their reply, "[g]rievance URF 04-06-1204-12E does not appear anywhere on the list of grievances received at Step III. Had Plaintiff in fact submitted a Step III appeal, it would have appeared on the Grievance Inquiry printout[.] That grievance does

---

[12]Plaintiff claims Merling was ineligible to respond to his grievance per MDOC PD 03.02.130. Doc. Ent. 1 ¶ 19.

[13]GERD is "[t]he abbreviation for *gastroesophageal reflux disease*." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 2, G-59 (1995).

not appear, although there are several other grievances filed in 2004, 2005, and 2006 that do appear; therefore, Plaintiff knows how to submit a Step III appeal. The Grievance Inquiry . . . establishes that Plaintiff did not appeal this grievance to Step III, and he has not refuted this evidence. Thererfore, Plaintiff did not exhaust his claims against Merling and Covert." Doc. Ent. 69 at 6. The Court should agree and conclude that plaintiff's claims against Merling and Covert are unexhausted.[14]

## 2. Some of the claims against Ives should be dismissed, and the claims against Gardon and Lee should be dismissed.

**a.** Plaintiff identifies Gardon, Ives and Lee as registered nurses at JCF. Doc. Ent. 1 at 2. Section II of the complaint (¶¶ 26-101) concerns Cotton Correctional Facility (JCF). This portion of the complaint begins with plaintiff's apparent July 7, 2004 admission to Foote Hospital and concludes with an alleged August 22, 2005 threat by Ives. Doc. Ent. 1 ¶¶ 26, 101.

A brief note about plaintiff's cancer treatment is relevant to plaintiff's JCF-related claims. On June 29, 2004, plaintiff underwent a CT chest scan. Doc. Ent. 1-4 at 35-36. On July 6, 2004, plaintiff was informed that his CT scan showed Lymphoma. Doc. Ent. 1 ¶ 24. On July 7, 2004, plaintiff was admitted to Foote Hospital. Doc. Ent. 1 ¶¶ 25-26. He was placed under the care of oncologists Axelson, Trimble, Boxer, Winegarden, Hirth and Madani. Doc. Ent. 1 ¶ 26.

---

[14]In response to defendants' motion, plaintiff argues that "Covert and Merling's actions were deliberately indifferent[.]" Doc. Ent. 56 at 2-4. Plaintiff also argues that they "are not entitled to qualified immunity[.]" Doc. Ent. 56 at 4. Defendants reply that Covert and Merling "did not act with deliberate indifference when they dealt with Plaintiff on June 15, 2004 and July 3, 2004, respectively." Doc. Ent. 69 at 6-7. However, in light of my conclusion that plaintiff's claims against Covert and Merling are unexhausted, I do not address the claims on the merits.

On July 15, 2004, plaintiff underwent surgery during which a CNS reservoir[15] was placed in his head. Doc. Ent. 1 ¶ 30; Doc. Ent. 1-4 at 38. He was discharged to JCF on August 4, 2004. Doc. Ent. 1 ¶ 31. On August 30, 2004, plaintiff was seen by the Center for Hematology-Oncology and was re-admitted to Foote Hospital. Doc. Ent. 1 ¶ 32; Doc. Ent. 1-2 at 1. He was discharged to JCF on September 13, 2004 or September 14, 2004. Doc. Ent. 1 ¶ 32; Doc. Ent. 1 ¶ 69. Plaintiff's discharge summary from Hirth set forth a list of discharge medications, as well as the following discharge instructions: "The patient [is] discharged to cell. He has a return appointment scheduled in our office on September 17 to recheck his blood counts." Doc. Ent. 1-4 at 40-41.

On November 8, 2004, plaintiff completed a health care request regarding his feet and ankles. The November 9, 2004 instructions note that an appointment would be scheduled with an MSP. Doc. Ent. 1 at 23; Doc. Ent. 1 ¶ 33. On or about November 18, 2004, plaintiff spoke with Ives about the swelling in his right foot, and she took plaintiff directly to health services. Doc. Ent. 1 ¶ 34-35. Dr. Antonini prescribed Carbamazepine (Tegretol).[16] Doc. Ent. 1 ¶ 35-36; Doc. Ent. 1 at 42.

On November 19, 2004, plaintiff was seen at the Center for Hematology-Oncology and began the Maintenance Course of Chemotherapy. Doc. Ent. 1 ¶ 39; Doc. Ent. 1 at 26; Doc. Ent. 1-3

---

[15]An Ommaya reservoir is "[a] plastic container placed beneath the galea aponeurotica (a fibrous membrane of the scalp) and connected by means of a tube with the lateral ventricle (a space within the brain). The container is used to remove fluid from the ventricle (when necessary) or to inject medication into the ventricle." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, O-47 (1995).

[16]Carbamazepine is "[a] medicinal substance used to prevent or relieve convulsions." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 1, C-45 (1995). Tegretol is "[a] medicine used in the treatment of epileptic seizures and trigeminal neuralgia[.]" SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 4, T-24 (1995).

at 21.[17]  Plaintiff claims his Prednisone[18] prescription was not filled until November 24, 2004. **According to plaintiff, this was the first time "MDOC Medical staff interfer[ed] with the prescribed Treatment Plan[.]"**  Doc. Ent. 1 ¶ 43.[19]

Plaintiff received a chemotherapy treatment on February 10, 2005.  As of February 13, 2005, plaintiff had missed four (4) days of his Prednisone regimen.  Doc. Ent. 1-2 at 6.  **According to plaintiff, this was the second time his prescription for Prednisone had not been filled.  Doc. Ent. 1-2 at 4 ¶ 76.**  On or about February 17, 2005, plaintiff was seen at the Center for Hematology-Oncology, at which time plaintiff stated he did not receive Prednisone as ordered by Hirth on February 10, 2005.  Doc. Ent. 1-2 at 5.

On March 21, 2005, Boxer prescribed Prochlorperazine,[20] Methotrexate[21] (to be taken on March 24, 2005) and Mercaptopurine.[22]  It also appears that Boxer prescribed Thera Multivitamin

_____

[17]Attached to plaintiff's complaint are the eleven week drug descriptions for "Maintenance Course: Sequence #1" and "Maintenance Treatment: Second Sequence".  Doc. Ent. 1-4 at 43-44.

[18]Prednisone is "[a] medicinal substance having the properties of cortisone but having greater power to overcome inflammation, especially in the inflammatory changes of joint disease."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, P-302 (1995).

[19]On or about December 16, 2004, Nurse Russ and Dr. Antonini prescribed Prilosec.  Doc. Ent. 1 at 42.

[20]Prochlorperazine is "[t]he generic name of a medicine used to check nausea and vomiting."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, P-328 (1995).

[21]Methotrexate is "[a] chemical substance used as an antineoplastic (to treat cancer).  It is also used as an immunosuppressive agent (to diminish or check the immunological response to the body when that is desirable)."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, M-169 (1995).

[22]Mercaptopurine is "[t]he generic name of a medicine used as a antineoplastic drug in the treatment of certain leukemias."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, M-169 (1995).

Tablets. On March 28, 2005, Antonini prescribed Methotrexate to be taken that day. Trimble prescribed Methotrexate on April 4, 2005 to be taken on April 7, 2005. Doc. Ent. 1 at 42.

On April 21, 2005, plaintiff was seen at the Center for Hematology-Oncology. Doc. Ent. 1 at 38-39. On April 28, 2005, plaintiff's blood was tested by the Center for Hematology-Oncology, and he underwent a bone marrow biopsy. Doc. Ent. 1 ¶ 53; Doc. Ent. 1 at 40; Doc. Ent. 1-2 at 12. On May 5, 2005, plaintiff was seen by Boxer at the Center for Hematology-Oncology. Doc. Ent. 1 ¶ 55; Doc. Ent. 1-2 at 18. That day, Boxer wrote an order which discontinued plaintiff's Carbamazepine prescription and prescribed G-CSF.[23] Doc. Ent. 1-2 at 19.

On June 7, 2005, oncologist John A. Axelson recommended that plaintiff be placed in a single room. Doc. Ent. 1-2 ¶ 88; Doc. Ent. 1-2 at 27 (CMS Specialty Consult Report); Doc. Ent. 1-2 at 28. On July 7, 2005, oncologist Trimble wrote plaintiff a prescription for Methotrexate, stating "Give Methotrexate [by mouth] on 7-08-05 then next dose of Methotrexate due 7-15-05." The hematology/oncology office faxed it to the pharmacy on July 8, 2005. Doc. Ent. 1-2 ¶ 92.

On or about July 8, 2005, plaintiff suffered a "contusion on [his] 'Omaya' from contact with the bunk above his head." Doc. Ent. 1-2 ¶ 87; Doc. Ent. 1-2 at 22 (JCF-1579). By July 12, 2005, plaintiff had not received the Methotrexate he was supposed to take on July 8, 2004. **According to plaintiff, this was the third instance of his chemotherapy medication not being provided as prescribed.** Doc. Ent. 1-2 ¶ 91.

On or about July 20, 2005, plaintiff had another "abrasive contact with the [u]pper bunk, injuring [his] reservoir [Omaya] on the top of [his] head." Doc. Ent. 1-2 ¶ 96; Doc. Ent. 1-2 at 39.

---

[23]"Granulocyte colony-stimulating factor (G-CSF) is a hormone produced by the body that stimulates the bone marrow to produce more white blood cells. G-CSF is also made as a drug." *See* http://www.cancer.gov/clinicaltrials/results/neutropenia0807.

On July 21, 2005, plaintiff was seen by Hirth at the Center for Hematology-Oncology. Doc. Ent. 1-2 at 45. Plaintiff had an appointment with his MSP on July 25, 2005. Doc. Ent. 1-2 ¶ 88.

**b.**     Given the period of time covered by Section II of the complaint and examining the Step III grievance inquiry (Doc. Ent. 37-5), it appears that any of the twelve (12) JCF grievances listed could be at issue. Defendants' brief specifically discusses grievances JCF-04-11-02891-012f (Doc. Ent. 37-6 at 4-8), JCF-04-11-02892-012f (Doc. Ent. 37-6 at 9-13), JCF-05-02-00419-012f and JCF-05-05-01133-012f. Doc. Ent. 37 at 11-14. In addition to these grievances, plaintiff's response mentions JCF-05-07-01578-012f. Doc. Ent. 56 at 5-7. The following are the eight (8) JCF grievances attached to plaintiff's complaint:

   **1.**     **JCF-04-11-02891-012f:** On November 23, 2004, plaintiff completed a Step I grievance form claiming he had not received the medicine prescribed on November 18, 2004. C. Ives responded to and P. Lee reviewed the response on December 9, 2004. On December 21, 2004, plaintiff completed a Step II grievance appeal. Alfred Jones responded on or about January 14, 2005. Plaintiff completed a Step III grievance appeal. On March 17, 2005, Jim Armstrong approved a May 9, 2005 Step III grievance response prepared by N. Martin, which noted that "there have been problems regarding the filing of prescriptions. Administrative action is being taken . . . to ensure this is corrected." Doc. Ent. 1 at 27-31, 35-36; Doc. Ent. 37-6 at 4-8.

   **2.**     **JCF-04-11-02892-012f:** Plaintiff completed a Step I grievance form on November 23, 2004 based upon incidents occurring from November 19th to 21st - the delay in receiving his Prednisone. C. Ives responded to and P. Lee reviewed the response on December 9, 2004. On December 21, 2004, plaintiff completed a Step II grievance appeal. Alfred Jones responded on or about January 14, 2005, summarizing that "[m]edical staff said grievant received his medication on 11-22-04[.]" Plaintiff completed a Step III grievance appeal. On March 17, 2005, Jim Armstrong approved a March 9, 2005 Step III grievance response prepared by N. Martin, which noted that "there have been problems regarding the filling of prescriptions. Administrative action is being taken . . . to ensure this is corrected." Doc. Ent. 1 at 32-34; Doc. Ent. 37-6 at 9-13.

   **3.**     **JCF-05-02-00419-012f:** On February 13, 2005, plaintiff completed a Step I grievance form based upon incidents occurring from February 10th to 13th - the delay in receiving Prednisone. C. Ives responded to and B. Gardon reviewed the response on March 10, 2005. On March 16, 2005, plaintiff completed a Step II

grievance appeal. On March 29, 2005, Alfred Jones responded to the Step II appeal. On November 17, 2005, Jim Armstrong approved the August 3, 2005 Step III grievance response by N. Martin. Doc. Ent. 1-2 at 6-10.

**4.** **JCF-05-05-01133-012f:** Plaintiff completed a Step I grievance form on May 7, 2005 based upon an April 28, 2005 incident. On May 16, 2005 C. Ives responded to the grievance. On May 31, 2005, B. Gardon reviewed the response. On June 8, 2005, plaintiff completed a Step II grievance appeal. Alfred Jones responded on December 8, 2005. Plaintiff completed a Step III grievance appeal. On January 19, 2006, Jim Armstrong approved the January 14, 2006 response by N. Martin, which deemed the grievance resolved. Doc. Ent. 1-2 at 12-16.

**5.** **JCF-05-07-01578-012f:** Plaintiff completed a Step I grievance form on July 12, 2005, based upon incident dates of July 7th-11th and in part upon Trimble's July 7, 2005 prescription for Methotrexate. Kinder responded to the grievance on August 9, 2005, and Gardon reviewed the response on August 15, 2005. On August 26, 2005, plaintiff completed a Step II grievance appeal. Alfred Jones denied the grievance appeal on December 8, 2005. Plaintiff completed a Step III grievance appeal. The Step III response, prepared by N. Martin on January 14, 2006 and approved by J. Armstrong on January 19, 2006, notes in part that "[t]his matter is being reviewed for quality assurance purposes. It is noted that the Step II response was inordinately delayed. That should not have occurred[,]" and deems the grievance resolved. Doc. Ent. 1-2 at 31-35.

**6.** **JCF-05-07-01579-012i:** Plaintiff completed a Step I grievance form on July 12, 2005, based his July 8, 2005 inquiry regarding a single room and request to look at the contusion by his CNS Reservoir. Kinder responded on August 9, 2005 and Gardon reviewed the response on August 15, 2005. On August 26, 2005, plaintiff completed a Step II grievance appeal. Alfred Jones responded on December 8, 2005. Plaintiff completed a Step III grievance appeal. On January 19, 2006, J. Armstrong approved the January 14, 2006 response prepared by N. Martin, which noted that "there is no medical indication for grievance to have a single cell placement. Grievant's disagreement with this medical conclusion does not support his claim." Doc. Ent. 1-2 at 22-25.

**7.** **JCF-05-07-01639-12d3:** On July 21, 2005, plaintiff completed a Step I grievance based upon a July 20, 2005 incident. Kinder responded to the grievance on August 9, 2005, and Gardon reviewed the response on August 15, 2005. Plaintiff completed a Step II grievance appeal on August 26, 2005, and Alfred Jones responded on December 8, 2005. Plaintiff completed a Step III grievance appeal. N. Martin prepared a response on January 16, 2006, and it was approved by J. Armstrong on January 19, 2006. Doc. Ent. 1-2 at 39-43.

**8.** **JCF-05-08-01794-12e4:** On August 23, 2005, plaintiff completed a Step I grievance based upon an August 22, 2005 incident. M. Wilson responded on September 16, 2005, and Gardon reviewed the response on September 30, 2005. On October 6, 2005, plaintiff completed a Step II grievance appeal. Alfred Jones responded to the Step II grievance appeal on December 8, 2005. The Step III grievance response was prepared by N. Martin on January 16, 2006 and approved by J. Armstrong on January 19, 2006. Doc. Ent. 1-2 at 47-50, Doc. Ent. 1-3 at 1.

In addition to these eight grievances, the grievance inquiry shows that grievances JCF-2004-10-2529-12f; JCF-2004-10-2553-12f and JCF-2005-06-1428-12z were appealed to Step III. Doc. Ent. 37-5 at 3. Additionally, a grievance received at Step III on July 22, 2005 was returned on July 26, 2005. Doc. Ent. 37-5 at 3 (176774).

**c.** Defendants argue that Ives, Gardon and Lee are entitled to summary judgment, because "[d]efendants Gardon and Lee had no involvement in the matters alleged except as grievance reviewers[,]" and "[t]he evidence does not support a finding that Defendants Ives, Gardon or Lee acted with deliberate indifference." Doc. Ent. 37 at 11-18. Within this argument, defendants contend that "Gardon and Lee had no personal involvement sufficient to subject them to liability under 42 USC § 1983." Doc. Ent. 37 at 14-15. According to defendants, "[t]here are no allegations or evidence that Lee or Gardon were actually involved with Plaintiff's medical care or treatment." Doc. Etn. 37 at 14.

Defendants also contend that "[t]he evidence does not support a finding that defendant Ives acted with deliberate indifference." Doc. Ent. 37 at 15-17. Furthermore, defendants contend that "Ives, Gardon, and Lee are entitled to qualified immunity." Doc. Ent. 37 at 18.

**d.** With respect to Lee and Gardon, plaintiff claims that *Shehee v. Luttrell*, 199 F.3d 295 (6th Cir. 1999) and *Coleman v. Martin*, 363 F.Supp.2d 894 (E.D. Mich. 2005) are distinguishable from this case. Doc. Ent. 56 at 8. Plaintiff's response contends that Lee and Gardon had "active roles in

the unconstitutional conduct of . . . Ives." Plaintiff notes that Lee and Gardon are nurses and supervisors. "They had an obligation to ensure that constitutional violations did not occur and when they did occur, and [they] became aware of their occurrence, they were obligated to correct the problem. Instead, they acquiesced in the unconstitutional conduct and it continued to occur until Plaintiff was transferred from JCF." Plaintiff maintains that Gardon and Lee "did have the authority to correct the problems occurring within JCF Health Care, resulting in Plaintiff's Eighth Amendment rights being violated repeatedly." Doc. Ent. 56 at 8. Plaintiff's citations to *Risbridger v. Connelly*, 122 F.Supp.2d 857, 869 (W.D. Mich. 2000), among other cases, suggests that his claims against Lee and Gardon are based upon supervisory liability. Doc. Ent. 56 at 8-9. In anticipation of an argument from defendants that "there is no 'proof' of whether Nurse Supervisors and Health Unit Managers are in fact responsible for the claims in plaintiff's complaint[,]" plaintiff points to the July 7, 2004 report of Robert L. Cohen - specifically the section on "Nursing Services." Doc. Ent. 56 at 9-10; Doc. Ent. 56 at 16-18.

As to Gardon and Lee, defendants reply that "[b]ecause they had no involvement in Plaintiff's treatment, and only became aware of his concerns after the fact by way of responding to his grievances, they were not 'personally involved' sufficiently to expose them to liability under 42 USC § 1983." Doc. Ent. 69 at 7. Of the aforementioned eight (8) grievances, Lee reviewed two (2) of Ives's Step I responses (JCF-2891, JCF-2892). Gardon reviewed two (2) of Ives's Step I responses (JCF-00419, JCF-1133), as well as three (3) of Kinder's Step I responses (JCF-1578, JCF-1579, JCF-1639) and one (1) Step I response by Wilson (JCF-1794). In his complaint, plaintiff alleges that there is no incentive for Gardon to "cease and desist interfering with the Prescribed Treatment Plan[,] because it did not stop, even after their acknowledgment that changes and

corrections needed to be made. . . . There was never an intent to stop, just an intent to fool me into thinking they were." Doc. Ent. 1-2 ¶ 78. Plaintiff also claims that Ives and Gardon collaborated to author the May 2005 Step I response to JCF-1133 and that Ives, Gardon and Antonini almost gave plaintiff and his family another scare. Doc. Ent. 1-2 ¶¶ 83, 85; Doc. Ent. 1-2 at 13.

The Court should dismiss plaintiff's claims against defendant Lee and Gardon. To be sure, plaintiff's November 23, 2004 grievance (JCF-2891) does state that plaintiff's family "has called P. Lee numerous times due to the aforementioned deliberate acts and nothing changes. This is yet another instance of the failure to properly manage what is supposed to be a medical care providing service to MDOC Prisoners in general and this writer in particular." Doc. Ent. 37-6 at 7. The Step II appeal states that Lee's "cover-up and lack of diligent investigation leaves the problem unsolved and open to be repeated again at some point in the future." Doc. Ent. 37-6 at 5. Furthermore, the Step II appeal in JCF-2892 states, "Peggy Lee, et. al., had the foreknowledge to have the medications available to me as soon as they received the prescription order from the Cancer Specialist. By failing to do so, P. Lee et. al., have endangered my life and cut down the probability of me being healed of this illness." Doc. Ent. 37-6 at 10. Also, plaintiff's February 13, 2005 grievance (JCF-0419) alleges that Lee and Ives "are intentionally interfering with the treatment of [his] cancer. They both have been previously made aware of the serious nature of the failures to fill prescriptions made by [his] Oncologists." Doc. Ent. 1-2 at 6.

Nonetheless, in her November 20, 2007 affidavit, Peggy Lee states that she "was only at JCF for a short period of time, from May 2004 to March 2005, in the capacity of Acting Health Unit Manager. As part of [her] duties there, [she] acted as reviewer of Step I grievances involving health care." Doc. Ent. 37-6 at 2 ¶ 3. With respect to grievances JCF-04-11-2891-12f and JCF-04-11-

2892-12f, Lee states that "a review of Plaintiff's medical records was completed and the response was prepared by the Respondent. [Lee] reviewed the grievance responses to ensure accuracy and appropriateness. The grievance responses addressed Plaintiff Davis' medical concerns sufficiently at the time of the responses." Doc. Ent. 37-6 at 2 ¶ 4. She further states that her "only involvement with Plaintiff Davis was as Reviewer of the Step I grievance responses. [She] did not have any direct involvement with Plaintiff Davis with regard to his medical care." Doc. Ent. 37-6 at 3 ¶ 5.

In her December 6, 2007 affidavit, Beth Gardon admits to reviewing and signing the Step I grievance responses on JCF-4190 and JCF-1133. She claims that her "signature on these grievances reflects that [she] reviewed the grievance responses and ensured that the response appropriately addressed the issues raised and that the response accurately reflected departmental policy and procedure." Doc. Ent. 39-3 ¶ 3. She further states that she "had no personal involvement in evaluation or treating prisoner Davis." Doc. Ent. 39-3 ¶ 4.

To the extent plaintiff's claims against Lee and Gardon are based upon their roles in reviewing the Step I responses to the aforementioned JCF grievances, the Sixth Circuit has provided that where defendants' "only roles . . . involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983." *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999). "[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee*, 199 F.3d at 300 (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998)). Claims which are based simply on the denial of a grievance do not state a claim of constitutional dimension. *See Martin v. Harvey*, No. 00-1439, 2001 WL 669983, **2 (6th Cir. June 7, 2001) ("The denial of the grievance is not the same as the denial of a request to receive medical care."); *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999) (as against defendants whose

21

only involvement was the denial of administrative remedies and the "failure to remedy the alleged retaliatory behavior[,]" "[t]here is no allegation that any of these defendants directly participated . . . in the claimed . . . acts[]."); *Weaver v. Toombs*, 756 F.Supp. 335, 337 (W.D. Mich. 1989) ("The mere fact that these defendants found plaintiff Martin's grievance concerning the seizure to be without merit is insufficient to state a claim against them."); *Coleman*, 363 F.Supp.2d 894, 903 (E.D. Mich. 2005) (Tarnow, J. adopting report and recommendation of Majzoub, M.J.) ("Plaintiff cannot impose liability on Defendant Marschke for his role in signing and rejecting a Step I grievance filed by Plaintiff.").

Furthermore, to the extent plaintiff's claims against Lee and Gardon are based upon their failure to act even though they were aware of his complaints, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). Citing JCF-2892 (responded to by Ives and Lee), JCF-0419 (responded to by Ives and Gardon) and JCF-1578 (responded to by Kinder and Gardon) and the fact that he was grieving defendants' failure to fill his chemotherapy medications, plaintiff claims defendants "had all the information needed and necessary to prevent their repeated failures to provide his Specialist prescribed chemotherapy medications. If not for their indifference, no interruption in Plaintiff's treatment of cancer, occurs." Doc. Ent. 56 at 7.[24] However, "a failure of a supervisory official to

---

[24]Plaintiff points out the Supreme Court's statement that Eighth Amendment indifference to serious medical needs can arise "whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976) (footnotes omitted). Plaintiff also points out that "[c]omplying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one." *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991). Doc. Ent. 56 at 7.

supervise, control, or train the offending individual officers is not actionable absent a showing that the official either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). *See also Hicks v. Frey*, 992 F.2d 1450, 1455 (6th Cir. 1993) ("even though an official is not directly involved in alleged unconstitutional acts, the official may be held liable for failure to supervise and control his subordinates upon a showing that the official 'either encouraged the specific incident of misconduct or in some other way directly participated in it. At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.'") (citing *Hays*, 668 F.2d at 874 and *Rizzo v. Goode*, 423 U.S. 362 (1976)); *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984) (on appeal from district court judgment granting motion for directed verdict, "Bellamy has made no showing that any of the supervisory officials who were defendants in this case actively participated in or authorized any harassment of appellant. The testimony presented by Bellamy, at best, indicates that some instances of alleged harassment were brought to the attention of prison supervisory officials."); *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1246 (6th Cir. 1989) ("'The law is clear that liability of supervisory personnel must be based on more than merely the right to control employees.'") (quoting *Hays*, 668 F.2d at 872). *But see Rosen v. Chang*, 811 F.Supp. 754, 759 (D.R.I. 1993) ("But when a supervisor is accused, they 'need not have actual knowledge of the specific incident ... if they had the power and duty to alleviate the conditions which led to the violation.'") (quoting *Miranda v. Munoz*, 770 F.2d 255, 260 (1st Cir. 1985)).

e.    **Plaintiff's claims against Ives are varied.**  Plaintiff claims he wrote grievance **JCF-2891** on November 23, 2004, because he had not yet received the Tegretol prescribed by Antonini on November 18, 2004.  Doc. Ent. 1 ¶ 46.  Plaintiff takes issue with Ives's failure to document the November 18, 2004 incident in his medical file.  Doc. Ent. 1-2 ¶ 82.  In her December 5, 2007 affidavit, Connie Ives states that "[o]n November 18, 2004 prisoner Davis stopped [her] to show [her] his foot." Doc. Ent. 39-2 ¶ 3.  Ives "looked at his foot and informed him that the doctor needed to look at it. [She] escorted prisoner Davis to the examination room.  To the best of [her] recollection Dr. Antonini never said 'I don't want to see him.' [Gardon] informed prisoner Davis that Dr. Antonini had written a prescription for Tegretol and that he should receive it within a day or two.  [Gardon] did not tell Dr. Antonini prisoner Davis has neuropathy as that is a diagnosis, which [she] [is] not qualified to do.  After looking at the Plaintiff's foot, [she] suggested to the Plaintiff that the swelling and pain could be a side effect of chemotherapy. [She] did not take part in prescribing Tegretol to the Plaintiff."  Doc. Ent. 39-2 ¶¶ 4-9.  She notes that her Step I response in JCF-2891 stated, "Mr. Davis' medication was ordered and filled on 11-18-04 and picked up by him on 11-19-04.  The matter of the documentation will be discussed with Health Services staff during the next staff meeting."  Doc. Ent. 37-6 at 8; Doc. Ent. 39-2 ¶ 10; Doc. Ent. 1 ¶ 50.

In **JCF-2892** (incident date November 19-21, 2004), plaintiff alleges that Ives "has interfered with and prevented [him] from receiving the medication to treat [his] cancer[,] whereby said intentional acts are a threat to [his] life and may well result in [him] not being healed of[] this illness."  Doc. Ent. 37-6 at 12.  Ives's December 9, 2004 response summarizes that plaintiff "should have received his medication on 11-22-04, but did not receive it until 11/24/04.  Nursing staff will be notified to make sure his medication is ordered and he receives it as ordered by his specialist."

Doc. Ent. 37-6 at 13. Plaintiff claims that he was supposed to start taking Prednisone on November 19, 2004, and that Ives is "not qualified to adjust his chemotherapy Treatment Plan[.]" Doc. Ent. 1 ¶ 47.

Ives's March 10, 2005 response to **JCF-0419** (incident date February 10-13, 2005) states, "[d]ocumentation from Mr. Davis' medical record does not reflect that the pharmacy received the order. A phone call was made on 2-17-05 to JCF Health Services and orders were then faxed to the pharmacy. Mr. Davis received his medication on 2/17/05." Doc. Ent. 1-2 at 7. Plaintiff asserts that he did not receive the Prednisone until February 20, 2005. Doc. Ent. 1-2 ¶ 76. Noting Jones's Step II response that "[d]ocumentation from the JCF Medical Clinic reveals Mr. Davis received his Prednisone on February 20, 2005[,]" Doc. Ent. 1-2 at 8, plaintiff claims that Ives "rushed to cover-up the problem, by trusting [he] would be too sick to . . . pursue the matter through the grievance procedure." Doc. Ent. 1-2 ¶ 77. Plaintiff claims there is no incentive for Ives and Gardon to "cease and desist" interference with plaintiff's treatment. Doc. Ent. 1-2 ¶ 78. Ives notes that her Step I response in JCF-0419 "was based upon information [she] received from staff who dispensed the medication. At the time it was recorded, [she] believed it to be fact that [plaintiff] received his Prednisone on February 17, 2005. [She] now acknowledge[s] that the Plaintiff did not receive his Prednisone until February 20, 2005." Doc. Ent. 39-2 ¶¶ 11. Ives maintains that "[t]here was no collusion between Beth Gardon and [herself] in responding to the Plaintiff's grievances." Doc. Ent. 39-2 ¶ 12.

Ives's May 30, 2005 Step I response to **JCF-1133** (incident date April 28, 2005) noted that "[o]n 11-18-04 Mr. Davis requested pain medication for complaints of foot discomfort from side effects of chemotherapy. Tegretol 400 mg was ordered for his neuropathy. There is no current

documentation in his medical record revealing documentation of Tegretol f[ro]m the oncologist. The Tegretol was discontinued by his MSP." Doc. Ent. 1-2 at 13. Plaintiff claims that by Ives's own admission, she "failed to document, in [hi]s medical file, the interaction which led to her telling Dr. Antonini that [he] had 'neuropathy' - a side-effect from chemotherapy, in [his] right-foot." Doc. Ent. 1-2 ¶ 81. Defendants claim that "[t]his response states only that there was no order from the oncologist for Tegretol, not that defendant Ives failed to document the encounter on 11-18-04." Doc. Ent. 37 at 13.

In plaintiff's July 12, 2005 Step I grievance **JCF-1578** (incident date July 8-11, 2005), plaintiff claims that Ives and Gardon are both "supervisors [e]ntrusted with the responsibility to ensure that I receive my Oncologists' Ordered medications." Doc. Ent. 1-2 at 31. Plaintiff claims that a copy of the Chemotherapy Maintenance Schedule is in his medical file, and this is the second time he is taking this medicinal schedule. Doc. Ent. 1-2 ¶ 93; Doc. Ent. 1-4 at 43-44. Kinder's August 15, 2005 Step I response to JCF-1578 is illegible. Doc. Ent. 1-2 at 32. Plaintiff claims that "[a]ll the information needed to have the medication there and ready was in [his] medical file. When [his] oncologists' make recommendations or orders that JCF Medical does not want to follow, it cannot be found or was lost. But when they are supposed to act as my 'Medical Service Provider' and fail to do so, then it is the Oncologist fault." Doc. Ent. 1-2 ¶ 93.

Plaintiff contrasts Ives's May 30, 2005 Step I response in JCF-1133 (Doc. Ent. 1-2 at 13) with Kinder's August 9, 2005 Step I response to JCF-1639, "[t]here is no documentation in Mr. Davis medical record . . . a kite was received requesting to be called to Health Services to check his CNS reservoir for a bump. The CNS reservoir site is clear and dry with no signs or symptoms of an abrasion[;]" and with Kinder's August 15, 2005 Step I response to JCF-1578 regarding Trimble's

July 7, 2005 prescription for Methotrexate. Doc. Ent. 1-2 ¶¶ 82, 92; Doc. Ent. 1-2 at 13, 32, 40. Plaintiff alleges that Ives "used 'trick' semantics to camouflage the incident, while at the same time, confer[ring] responsibility onto my oncologist. A nefarious motive was there from the inception. Especially considering Nurse Ives kindly left out her role in the Tegretol incident." Doc. Ent. 1-2 ¶ 82. Specifically referring to the May 30, 2005 Step I response, plaintiff contends that "Ives and Gardon really put their heads together to create this response." Doc. Ent. 1-2 ¶ 83. Plaintiff claims that the May 30, 2005 Step I response infers a nefarious plot by this prescription of Tegretol, noting the response's inference that plaintiff's oncologist prescribed the Tegretol. Doc. Ent. 1-2 ¶ 84. Plaintiff claims that Ives, Gardon and Antonini's actions resulted in the unnecessary April 28, 2005 bone marrow biopsy. Doc. Ent. 1-2 ¶ 85.

It appears that plaintiff's Ommaya reservoir came in contact with the top bunk on July 8, 2005 and July 20, 2005. Doc. Ent. 1-2 ¶ 87; Doc. Ent. 1-2 at 22 (JCF-1579); Doc. Ent. 1-2 ¶ 96; Doc. Ent. 1-2 at 39 (JCF-1639). Plaintiff claims he hits his Ommaya reservoir on the bunk at least once per month. Doc. Ent. 1-2 ¶ 96. As for **JCF-1579**, in which plaintiff claimed that Ives informed him on July 8, 2005 that single cells were reserved for liver transplant patients, plaintiff notes Kinder's August 9, 2005 response that "[t]here is no documentation in Mr. Davis medical record that a kite was received requesting a single man room. He did discuss his request with his MSP during an appointment on 7-25-05 and was informed by his MSP that, per MDOC guidelines, he does not meet the criteria for a single man room." Doc. Ent. 1-2 ¶¶ 87-88; Doc. Ent. 1-2 at 22-23. Plaintiff claims it is easy to say this about his medical record "when access to a referenced document is unavailable. Also, we are talking about Nurses' who do not do very good record keeping to be referencing a record-keeping document." Doc. Ent. 1-2 ¶ 88. Plaintiff notes that the contusion on

his head was referenced in Hirth's July 21, 2005 notes; however, Ives refused to look at it on July 8, 2005. Doc. Ent. 1-2 at 45; Doc. Ent. 1-2 ¶ 89. Plaintiff claims that Kinder's August 9, 2005 Step I response to JCF-1579 does not mention plaintiff's contusion or Ives's refusal to look at it. Doc. Ent. 1-2 ¶ 89; Doc. Ent. 1-2 at 23.

In **JCF-1639** (incident date July 20, 2005), plaintiff stated, "[i]t is unlawful for Dr. Antonini, Nurse Ives, Nurse Montague, and Health Unit Manager Nurse Gardon, to be aware of the potential for harm and not follow my Specialist/Oncologist prescribed course of treatment and recommendations." Doc. Ent. 12 at 39. Plaintiff claims that Ives "has seen the result of hard contact with the [Ommaya], but has retaliated against [him], as she said she would by not engaging in any medically centered contact with [him], as evidenced by" Kinder's August 9, 2005 response to JCF-1639 (which does not mention Ives's refusal to look at the reservoir). Doc. Ent. 1-2 ¶ 97. Plaintiff points out that Jones's December 8, 2005 Step II response in JCF-1639 states in part, "Ms. Ives said she don't have any knowledge of grievant asking her to look at his reservoir. There is not enough information to substantiate this allegation." Doc. Ent. 1-2 ¶ 98; Doc. Ent. 1-2 at 41. Plaintiff alleges that "Nurse Ives claiming ignorance is simply an extension of the ignorance she claimed from the very beginning, with the Tegretol incident, she actually tried to 'create' ignorance then, now she's simply relying on the fruits of her labor." Doc. Ent. 1-2 ¶ 98. Plaintiff also points to the January 19, 2006 Step III grievance response, which states in part that "there is no documentation that he kited health care with a complaint about his reservoir. It appears that this grievance is another attempt by grievant to obtain a single cell which he has already been told has been determined not to be medically indicated." Doc. Ent. 1-2 at 43; Doc. Ent. 1-2 ¶ 99. Plaintiff alleges that "every time it benefits them, they cannot find something." Claiming that he has documentation of the

recommendation for a single cell, plaintiff contends, "[i]t is not about me disagreeing. I would never have even mentioned a singe cell, had my oncologist not recommended it first. . . . I am not the 'originator of the request'." Doc. Ent. 1-2 ¶ 99. Perhaps in defense of the matter raised in JCF-1639, Ives states that she "did converse with prisoner Davis about injuring his head on his bunk and informed him that he did not meet the established criteria for a single-man room. However, [she] was not involved in examining his head." Doc. Ent. 39-2 ¶ 13. She further claims that she "never attempted to cover-up any of prisoner Davis' medial information[,]" and that she has never "threatened to withhold treatment from prisoner Davis or from any patient." Doc. Ent. 39-2 ¶¶ 14-15.

Plaintiff also alleges that on August 22, 2005, Ives threatened plaintiff "while en route to morning med-lines." Doc. Ent. 102 ¶ 100; Doc. Ent. 1-2 at 47 (**JCF-1794**). Plaintiff claims that Ives said, "Why did you write a grievance on me for not looking at your head, you never asked me to look at your head." Plaintiff responded, and he alleges that Ives replied, "That's Bulls-t! Don't ever ask me to do anything to help you, because I'm not doing it!" Doc. Ent. 1-2 ¶ 100. Perhaps this is the threat referred to earlier in plaintiff's complaint. Doc. Ent. 1 ¶ 75. Plaintiff claims that Nurse Wilson's September 16, 2005 response stated, "There is no record of a conversation taking place between the two parties." Doc. Ent. 1-3 ¶ 101; Doc. Ent. 1-2 at 48. Plaintiff also notes Jones's December 8, 2005 response that "Nurse Ives said she don't have any knowledge of Mr. Davis being threaten by her. Based on the information received, there is not enough documentation to substantiate grievant's allegation." Doc. Ent. 1-2 at 49; Doc. Ent. 1-3 ¶ 101. Plaintiff also notes the January 19, 2006 Step III grievance response, which states in part, "This allegation cannot be substantiated. Nursing staff is expected to behave in a professional manner toward all patients.

Patients are expected to act responsibly. The two are expected to work together to attain the common goal of stable health for the patient." Doc. Ent. 1-3 at 1; Doc. Ent. 1-3 ¶ 101. Plaintiff argues that his allegations were substantiated, "otherwise there would have been no need for the 'pep-talk/reply[.]'" Doc. Ent. 1-3 ¶ 101.

**Defendants argue** that Ives is entitled to summary judgment. Doc. Ent. 37 at 15-17. With respect to plaintiff's claim that Ives should not have diagnosed plaintiff's neuropathy in November 2004, defendants note that "Ives looked at Plaintiff's swollen foot, thought he should see the doctor, went in to speak with the doctor, who determined that the Tegretol would help Plaintiff's swelling and neuropathy." Doc. Ent. 37 at 15. Defendants claim "[t]here is no evidence on this record that Defendant Ives took any action inconsistent with her training as a Registered Nurse, or that she acted with deliberate indifference to Plaintiff's medical needs." Doc. Ent. 37 at 16. With respect to plaintiff's claim regarding a single-cell, defendants contend that "the failure to provide a single cell does not amount to deliberate indifference merely because [plaintiff] must exercise more caution while getting in and out of his bunk." Doc. Ent. 37 at 16. With regard to plaintiff's claim involving the July 2005 prescription for Methotrexate, defendants note that "[w]hile the confusion in getting the prescription to JCF's medical staff and in Plaintiff's record and the delay in getting his medications is all unfortunate, there is no evidence of deliberate indifference by Defendant Ives . . . or even any evidence that they personally and purposely caused these problems." Doc. Ent. 37 at 16-17. Also, defendants argue that, even if Ives made the comment plaintiff alleges she did on August 23, 2005, "it is clearly a flippant response borne out of perhaps frustration or anger, but there is no evidence that Plaintiff did not receive any necessary health care. Verbal assaults like that alleged here do not amount to Eighth Amendment violations." Doc. Ent. 37 at 17.

**Plaintiff responds** that "Defendant Ives is the only person to claim Plaintiff had neurop[a]thy." In response to Ives's affidavit (¶8), plaintiff suggests that Ives told Antonini plaintiff had neuropathy and that diagnosis nearly cost plaintiff his life. Plaintiff also notes Ives's failure to document plaintiff's November 18, 2004 visit to Health Care in plaintiff's medical record. Plaintiff claims this visit is only recorded in the response to JCF-002891 and in Ives's affidavit. Plaintiff claims this omission prevented follow-up. In the end, his chemotherapy was interrupted, among other things. Ives's diagnosis, plaintiff claims, was the reason plaintiff was put on Tegretol. Doc. Ent. 56 at 5. Plaintiff claims Ives did not have the authority to make the diagnosis. Plaintiff claims "[t]he record clearly indicates that Defendant Ives made the 'neuropathy' diagnosis[.]" Doc. Ent. 56 at 6. Plaintiff contends that Ives's admissions and failures "indicate a state of mind far more culpable than 'mere negligence'." Doc. Ent. 56 at 6. As plaintiff notes, "an Eighth Amendment claimant need not show that a prison official acted or failed to act believing that harm actually would befall an inmate; it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994). Plaintiff contends that "reasonable inferences suggest that the repeated instances of criminal recklessness by Defendant Ives, would indicate an intent to harm Plaintiff[.]" Doc. Ent. 56 at 6. Plaintiff also notes that, "[i]n most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew. Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005). Plaintiff further notes that deliberate indifference "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835.

Noting plaintiff's oncologist Axelson's July 7, 2005 request that plaintiff be placed in a single cell, allegedly based upon plaintiff's hitting his Ommaya on the bunk and plaintiff's cellmate coming into contact with the Ommaya, plaintiff responds that defense counsel is engaging in the practice of medicine "by instructing Plaintiff to 'exercise more caution'[.]" Doc. Ent. 56 at 7.

Plaintiff responds that there were multiple instances of failures to fill his chemotherapy medication prescriptions. He specifically notes JCF-02892 (Prednisone); JCF-01419 (Prednisone) and JCF-01578 (Methotrexate). Plaintiff claims that defendants "had all the information needed and necessary to prevent their _repeated_ failures to provide his Specialist prescribed chemotherapy medications. If not for their indifference, no interruption in Plaintiff's treatment of cancer, occurs." Doc. Ent. 56 at 7. As plaintiff recognizes, deliberate indifference may result from "prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle v. Gamble*, 429 U.S. 97, 104-105 (1976) (footnotes omitted). Doc. Ent. 56 at 7. Plaintiff further recognizes that "[c]omplying with a doctor's prescription or treatment plan is a ministerial function, not a discretionary one." *Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991)

As for defendants' claim that there is no evidence that Ives was deliberately indifferent, plaintiff contends that the neuropathy diagnosis "was the 'brainchild' of Defendant Ives, as such a diagnosis was never made." Doc. Ent. 56 at 7. Plaintiff claims "there was no diagnosis made by a medical professional qualified and authorized to do so[:]

> That Defendant Ives failed to record her findings of the 'evaluation' of Plaintiff's foot, evinces Deliberate Indifference. She recognized he had a serious medical need, then failed to take the steps necessary to ensure this need was treated.

Doc. Ent. 56 at 8. It is plaintiff's position that "[t]he prescription of Tegretol by Defendant Antonini does not amount to treatment, because he prescribed it without knowing what the problem was." Doc. Ent. 56 at 8. As for the claim that Ives threatened plaintiff with non-treatment on August 22, 2005, plaintiff's cites Cohen's July 7, 2004 report, wherein Cohen stated that "[a]ccording to discussions I have had with prisoners and with members of the nursing staff, some nurses do not speak respectfully to prisoners." Doc. Ent. 56 at 10; Doc. Ent. 56 at 17. Plaintiff claims this is not about constitutionalizing Ives's threat, but claims "[i]t was submitted in support of the actions of Defendant Ives regarding her refusal to look at Plaintiff's head." Plaintiff claims that "[r]efusing to provide him medical treatment and making the threat in the presence of a subordinate inferred the threat would be followed up on and carried out by the subordinate to Defendant Ives." Doc. Ent. 56 at 10. Plaintiff asserts that Ives "offers nothing to refute the evidence that h[er] level of care was grossly substandard other than to say that [s]he exercised h[er] medical judgment[.]" *Comstock v. McCrary*, 273 F.3d 693 (6th Cir. 2001). Plaintiff claims that Ives "acted outside the scope of her authority and as a result Plaintiff suffered a serious injury." Doc. Ent. 56 at 10. In support of this statement, he refers to ¶ 68 of the complaint.

**Defendant replies** that Ives "evaluated Plaintiff's foot on November 18, 2004 and took him to the exam room; Dr. Antonini prescribed Tegretol, which was filled on November 19, 2004. Her only other contact with Plaintiff was speaking with him about bumping his head on his bunk, and telling him that he did not meet the established criteria for a single-man room. She was not involved in the examination of his head, however. Again, Plaintiff disagrees with the treatment rendered by Defendant Ives; but the fact that she did not ignore his concerns refutes Plaintiffs' claim of deliberate indifference." Doc. Ent. 69 at 7-8.

**The Court should conclude that some of the claims against Ives survive summary judgment. First, plaintiff takes issue with the events relating to plaintiff showing his foot to Ives on November 18, 2004.** Doc. Ent. 1 ¶ 34. Plaintiff alleges that Ives told him the doctor needed to see plaintiff's foot, took plaintiff to an examination room and asked Antonini to look at plaintiff's foot. However, Antonini would not see plaintiff. Ives returned five minutes later and informed plaintiff that Antonini had written a prescription for Tegretol. Doc. Ent. 1 ¶ 35.

Specifically, plaintiff notes Ives's December 9, 2004 response to plaintiff's November 23, 2004 grievance about the failure to receive the November 18, 2004 prescription of Tegretol (Doc. Ent. 37-6 at 7-8 (JCF-2891)), as well as Ives's May 2005 response to plaintiff's May 7, 2005 grievance about plaintiff's April 28, 2005 bone marrow biopsy (Doc. Ent. 1-2 at 12-13 (JCF-1133), and apparently takes issue with Ives's failure to document the November 18, 2004 interaction in his medical record. Doc. Ent. 1 ¶ 50, Doc. Ent. 1-2 ¶ 80; Doc. Ent. 1-2 ¶ 81; Doc. Ent. 1-2 ¶ 82. Plaintiff points out that Ives's May 2005 response states that "[o]n 11-18-04 Mr. Davis requested pain medication for complaints of foot discomfort from side effects of chemotherapy[,]" and questions the origin of this information. Doc. Ent. 1-2 at 13 (JCF-1133); Doc. Ent. 1-2 ¶ 82. Ives's response continued, "Tegretol 400 mg was ordered for his neuropathy. There is no current documentation in his medical record revealing documentation of Tegretol f[ro]m the oncologist. The Tegretol was discontinued by his MSP." Doc. Ent. 1-2 at 13. Plaintiff claims this answer is an intentional "smoke-screen[,]" and Ives has "used 'trick' semantics to camouflage the incident, while at the same time, confer[ring] responsibility onto [plaintiff's] oncologist. A nefarious motive was there from the inception. Especially considering Nurse Ives kindly left out her role in the Tegretol incident." Doc. Ent. 1-2 ¶ 82. Ives's affidavit reiterates her December 9, 2004 Step I response to

JCF-2891, wherein she states that "[t]he matter of the documentation will be discussed with Health Services staff during the next staff meeting." Doc. Ent. 39-2 at 3 ¶ 10; Doc. Ent. 37-6 at 8 (JCF-2891). Additionally, Ives's December 9, 2004 Step I response and Jones's January 14, 2005 Step II response to JCF-2891 state that "[d]ocumentation in Mr. Davis' medical record reflects the medication [Tegretol] was ordered an filled on 11-18-04." Doc. Ent. 37-6 at 8, Doc. Ent. 37-6 at 6 (JCF-2891)). Plaintiff compares Ives's May 2005 statement that "[t]here is no current documentation in his medical record revealing documentation of Tegretol f[ro]m the oncologist[,]" with the same-response statement that "[t]he Tegretol was discontinued by [plaintiff's] MSP[,]" Doc. Ent. 1-2 at 13 (JCF-1133). Plaintiff appears to claim this is misleading. Doc. Ent. 1-2 ¶ 83. The Tegretol was discontinued by Boxer on May 5, 2005. Doc. Ent. 1-1 at 19. To the extent plaintiff alleges that Ives's failure to document his November 18, 2004 visit in plaintiff's medical record resulted in an unnecessary bone marrow biopsy, interruption of his cancer treatment, lack of follow up, etc., plaintiff relies upon *Ginest v. Board of County Com'rs. of Carbon County*, 333 F.Supp.2d 1190, 1200 (D.Wyo. 2004) ("Medical records that are 'inadequate, inaccurate and unprofessionally maintained' create 'a grave risk of unnecessary pain and suffering' in violation of the Eighth Amendment.") (quoting *Cody v. Hillard*, 599 F.Supp. 1025, 1057 (D.S.D.1984)). *See also Ferguson v. Correctional Medical Services, Inc.*, No. 5:05-CV-00078, 2007 WL 707027, *3 (E.D. Ark. Mar. 1, 2007) ("Plaintiff has not alleged or demonstrated how Dr. Ifediora's failure to place his note of the October 8th procedure in the chart gave rise to a grave risk of unnecessary pain and suffering."). Here, plaintiff has alleged and supported how the omission of the November 18, 2004 incident "gave rise to a grave risk of unnecessary pain and suffering." *Ferguson*, 2007 WL 707027, *3. Therefore, defendants are not entitled to summary judgment on plaintiff's documentation claim against Ives.

In a claim related to the documentation claim, plaintiff takes issue with Ives's authority to make a diagnosis. Doc. Ent. 1-2 ¶ 81. Plaintiff alleges that Ives played a part in prescribing Tegretol. Doc. Ent. 1-2 ¶ 82. Plaintiff alleges that the November 18, 2004 incident resulted in an unnecessary April 28, 2005 bone marrow biopsy. Doc. Ent. 1-2 ¶ 85. Ives attests that she "did not tell Dr. Antonini prisoner Davis ha[d] neuropathy as that is a diagnosis, which [she] [is] not qualified to do. After looking at the Plaintiff's foot, I suggested to the Plaintiff that the swelling and pain could be a side effect of chemotherapy." Doc. Ent. 39-2 ¶ 8. She further contends that she "did not take part in prescribing Tegretol to the Plaintiff." Doc. Ent. 39-2 ¶ 9. However, in his complaint, plaintiff cites Ives's May 2005 Step I response to JCF-1133, in which she states that "Tegretol 400 mg was ordered for his neuropathy[,]" Doc. Ent. 1-2 at 13 (JCF-1133), and claims that "[b]y her own admission Nurse Ives failed to document, in my medical file, the interaction which led to her telling Dr. Antonini that [he] had 'neuropathy'[.]'" Doc. Ent. 1-2 ¶ 81. To the extent plaintiff claims that Ives did not have authority to diagnose his condition on November 18, 2004, his claim does not survive summary judgment. *Banks v. County of Allegheny*, __ F.Supp.2d __, 2008 WL 2619760, 15 (W.D. Pa. June 30, 2008) ("The mere fact that she [the clinician] is not a doctor fails to state a claim of deliberate indifference as the Constitution does not mandate that inmates be seen and treated necessarily by doctors."); *Ammons v. Lemke*, 426 F.Supp.2d 866, 873 (W.D. Wis. 2006) ("As a nurse, defendant Ericson was not qualified to diagnose plaintiff's condition. Nor was she qualified to prescribe a course of treatment."); *Chauncey v. Evans*, 2003 WL 21730580, *7 (N.D. Tx. 2003) (where "[p]laintiff argue[d] the treatment . . . constitute[d] deliberate indifference to a serious medical need because defendant WILCOX is a licensed vocational nurse, not a doctor, and only a doctor can legally diagnose and prescribe treatment[,]" the court stated, "prison personnel, from

nurses who have qualified as physician's assistants to those concerned only with security such as the every-day guard at the inmate's cell, must evaluate inmate complaints and exercise some judgment concerning whether the inmate needs to immediately see a physician.").

**Second, plaintiff takes issue with the first time his prescription for Prednisone was tardy.** As for Ives's December 9, 2004 Step I response to JCF-2892, plaintiff claims he was supposed to take his Prednisone on November 19, 2004, and he takes issue with Ives's December 9, 2004 Step I response that he "should have received his medication on 11-22-04[.]" Doc. Ent. 1 ¶¶ 47. The documentation from plaintiff's November 19, 2004 visit to the Center for Hematology-Oncology does document an order for Prednisone. Doc. Ent. 1 at 26. Although it is difficult to read the doctor's order, even if plaintiff should have begun his Prednisone on November 19, 2004, there is no indication that Ives's reference to November 22, 2004 was anything other than a typographical error or a misinterpretation of the doctor's order. In fact, by the time she wrote her December 9, 2004 response, plaintiff had his medicine (November 24, 2004).

**Third, plaintiff takes issue with the second time his prescription for Prednisone was tardy.** As for the accuracy of Ives's March 10, 2005 Step I response to plaintiff's February 13, 2005 grievance (JCF-0419) wherein he states that Lee and Ives are "intentionally interfering with the treatment of [his] cancer[,]" and wherein Ives responded that plaintiff received his Prednisone on February 17, 2005 (Doc. Ent. 1-2 at 7 (JCF-0419)), plaintiff claims he did not receive the Prednisone until February 20, 2005. Doc. Ent. 1-2 ¶ 76. Noting the difference between Ives's Step I response, and Jones's Step II response, wherein Jones acknowledged that plaintiff "received his Prednisone on February 20, 2005[,]" Doc. Ent. 1-2 at 8, plaintiff claims that "Nurse Ives rushed to cover-up the problem, by trusting [plaintiff] would be too sick to . . . [p]ursue the matter through the grievance

procedure." Doc. Ent. 1-2 ¶ 77. Plaintiff claims there is no incentive for Ives "to cease and desist interfering with the Prescribed Treatment Plan[,] because it did not stop, even after their acknowledgment that changes and corrections needed to be made. It was simply a play on words to pacify me. There was never an intent to stop, just an intent to fool me into thinking they were." Doc. Etn. 1-2 ¶ 78.

To the extent plaintiff's claim against Ives is based upon her Step I response to JCF-0419 (Doc. Ent. 1-2 at 7), plaintiff does not state a claim upon which relief may be granted. *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999). However, as to plaintiff's alleged second problem with his Prednisone prescription, plaintiff's allegations are made in a verified complaint. Doc. Ent. 1-4 at 31. Ives's affidavit states that her response "was based upon information [she] received from staff who dispensed the medication. At the time it was recorded, [she] believed it to be fact that [plaintiff] received his Prednisone on February 17, 2005. [She] now acknowledge[s] that the Plaintiff did not receive his Prednisone until February 20, 2005." Doc. Ent. 39-2 ¶ 11. It is plaintiff's position that medical specialists "send prescriptions back to the facility to be ordered from PharmCorr by the MSP at the facility." Doc. Ent. 56 at 11. In support of this statement, he cites Cohen's report, which states in part that "[m]edication orders are reviewed and transmitted to the pharmacy by nursing, and medications are distributed by nurses." Doc. Ent. 56 at 17. Therefore, on the issue of whether Ives was involved in the February 2005 tardiness of plaintiff's Prednisone prescription, Ives is not entitled to summary judgment.

**Fourth, plaintiff claims that Ives denied plaintiff's request to look at the contusion on his head.** As for Plaintiff's July 8, 2005 request for Ives to look at plaintiff's contusion, plaintiff claims he "was on call-out seeing Nurse Mary Ann Wilson and asked Nurse Supervisor Connie Ives

to look at the contusion," and asked about Axelson's recommendation that plaintiff be placed in a single cell, not being adhered to–to prevent this very sort of thing." According to plaintiff, "Nurse Ives told him a 'straight-faced, looking directly in the eyes, lie'–with 'only people needing liver transplants are placed in single rooms'." Doc. Ent. 1-2 ¶ 87. Plaintiff claims that Ives refused to look at the contusion. Doc. Ent. 1-2 ¶ 89. Plaintiff claims that Ives "has seen the result of hard contact with the Ommaya, but has retaliated against [him], as she said she would by not engaging in any medically centered contact with [him][.]" Doc. Ent. 1-2 ¶ 97. Plaintiff claims that Ives's retaliation is evidenced by Kinder's August 9, 2005 response to JCF-1639, which allegedly does not mention Ives or Ives's refusal to look at plaintiff's Ommaya reservoir. Doc. Ent. 1-2 ¶ 97; Doc. Ent. 1-2 at 40 (JCF-1639). Plaintiff asserts that "Nurse Ives claiming ignorance is simply an extension of the ignorance she claimed from the very beginning, with the Tegretol incident, she actually tried to 'create' ignorance then, now she's simply relying on the fruits of her labor." Doc. Ent. 1-2 ¶ 98. Plaintiff's assertions regarding his request to have Ives look at the contusion to his Ommaya reservoir and her refusal to do so are made in a verified complaint. Doc. Ent. 1-4 at 31; Doc. Ent. 1-2 ¶¶ 87, 89. This claim is not rebutted by Ives's statement that she conversed with plaintiff "about injuring his head on his bunk and informed him that he did not meet the established criteria for a single-man room. However, [she] was not involved in examining his head." Doc. Ent. 39-2 at 3 ¶ 13. Therefore, there is a question of fact regarding whether Ives was deliberately indifferent to a serious medical need.

**Fifth, plaintiff takes issue with an alleged threat by Ives.** Apparently related to Ives's August 22, 2005 threat, plaintiff claims that "when a Supervisor makes a threat of non-treatment – subordinates to that supervisor will have nothing less than the same attitude and behavior." Doc.

Ent. 1-2 ¶ 75; Doc. Ent. 1-2 ¶ 100. However, as defendants point out, "'[a]llegations of verbal abuse or harassment ... are insufficient grounds for relief under § 1983.'" *Davis v. Michigan Department of Corrections*, 746 F.Supp. 662, 667 (E.D. Mich. 1990) (quoting *Freeman v. Trudell*, 497 F.Supp. 481, 482 (E.D. Mich.1980)).

### 3. Some of the claims against Burt, McMillan, Stuparek, Roth and Perez should be dismissed.

**a.** Plaintiff identifies Burt as the JMF warden, McMillan as the JMF grievance coordinator, Roth as the director of nursing, Stuperak as the JMF CMS coordinator, and Perez as a JMF licensed practical nurse (LPN). Doc. Ent. 1 at 2. Section III of the complaint (¶¶ 102-154) concerns Southern Michigan Correctional Facility (JMF). This portion of the complaint spans the period from plaintiff's November 22, 2005 transfer from JCF to JMF to sometime in April 2007. Doc. Entries 1-3 at 3 to 1-4 at 30.

A brief note about plaintiff's medical treatment while incarcerated at JMF is relevant to plaintiff's JMF-related claims. On November 22, 2005, plaintiff was transferred from JCF to JMF. Doc. Ent. 1-3 ¶ 102. On December 5, 2005, plaintiff "was told by the med-line nurse [he] had 'one week' of morphine left." Plaintiff sent in a kite, but his pain medications "were not renewed until [he] had been out for 3 days." Doc. Ent. 1-3 at 21.

On December 15, 2005, JMF Officer Jackson allegedly attempted to interfere with plaintiff picking up his morning Morphine dosage. Plaintiff wrote to Burt on December 15, 2005, in part mentioning the same-day incident involving Corrections Officer Jackson. Doc. Ent. 1-3 at 4-6. According to plaintiff, Burt did not respond, but Jackson ceased harassing plaintiff. Doc. Ent. 1-3 ¶ 106.

On January 6, 2006, plaintiff wrote to Hammond regarding pain medication. Doc. Ent. 1-3 at 7-8; Doc. Ent. 1-3 ¶ 107. On January 10, 2006 at the afternoon medication line, Nurse Jennifer told plaintiff that she had received a new morphine prescription for plaintiff. Doc. Ent. 1-3 ¶ 109. Plaintiff wrote to Hammond again on January 12, 2006 regarding pain medication. Doc. Ent. 1-3 at 9-12; Doc. Ent. 1-3 ¶ 108. On January 13, 2006, the evening nurse informed plaintiff he was out of MS Contin. Doc. Ent. 1-3 ¶ 109. Plaintiff claims his 30 day morphine prescription "was stolen by someone within JMF Health Care under the supervision of Nurse Supervisor Betty Glasper." Doc. Ent. 1-3 ¶ 110. Plaintiff claims that on January 19, 2006, Glasper tricked plaintiff into signing off on JMF-00116, "by going to Walmart's, getting [his] pain medication that day and assuring [him] [he] would not run out of Morphine again." Doc. Ent. 1-3 ¶ 111.

On February 17, 2006, Hirth prescribed NovaSource BID. According to plaintiff, he did not receive it. Doc. Ent. 1-3 at 22. The same day, plaintiff went to the restricted medication line to receive 60 mg of Morphine, comprised of 30 mg MS Contin and 30 mg MSIR (morphine sulfate immediate release); however, he was only given 30 mg MS Contin. Doc. Ent. 37-7 at 11. Plaintiff claims that "Glasper was very convincing [in her response Step I response to JMF-00440] and [plaintiff] fell for the okey-doke." Doc. Ent. 1-3 ¶ 112; Doc. Ent. 37-7 at 15 (JMF-00440).

On March 14, 2006, plaintiff "asked Nurse Supervisor what did [he] need to do to make sure that [his] pain medication does not keep running out. Her response [was] 'I don't care.'" Doc. Ent. 1-3 at 21; Doc. Ent. 1-3 ¶ 115. That day, plaintiff wrote to Glasper regarding his medication not being renewed without the filing of a grievance. Doc. Ent. 1-3 at 25; Doc. Ent. 1-3 ¶ 114. On March 20, 2006, plaintiff wrote to the "Regional Health Administrator". Plaintiff claims this was a waste. Doc. Ent. 1-3 at 21-22; Doc. Ent. 1-3 ¶ 115. On March 25, 2006, plaintiff was "pushed to

JMF Health Care in a wheel chair[,]" where he was seen by Nurse Jeff. Nurse Jeff made a phone call and gave plaintiff 15 mg MSIR. According to plaintiff, he was then taking 165 mg morphine per day, which was not addressing his pain. Nurse Jeff "sent [plaintiff] out of Health Care walking . . it took over 25 minutes to make it less than 100 yards." Doc. Ent. 1-3 ¶ 119; Doc. Ent. 1-3 at 34 (JMF-00773). According to plaintiff, when he got back to the housing block he "had to be transported to DWH Emergency Room where [he] was given a shot of Demerol." Doc. Etn. 1-3 ¶ 119.

On March 27, 2006, plaintiff saw his oncologist and was admitted to Foote Hospital, where he underwent an MRI. According to plaintiff, the MRI revealed "4 herniated discs in [his] lower-back with 2 protruding and 1 showing degenerative disc disease." He was discharged to JMF on March 30, 2006. Plaintiff's discharge instructions were to take MS Contin 60 mg two times per day; MSIR 15-30 mg every four hours as needed; and [illegible] 300mg three times per day. Doc. Ent. 1-3 ¶ 117; Doc. Ent. 1-3 at 35 (JMF-00737); Doc. Ent. 1-4 ¶ 147.

On April 3, 2006, plaintiff was issued a medical detail by PA Hilling to expire on April 13, 2006. The detail stated, "cane, tray delivery, elevator use[.]" Doc. Ent. 1-3 at 26; Doc. Ent. 1-3 ¶ 117; Doc. Ent. 1-3 at 35 (JMF-00737). Plaintiff claims he was supposed to have seen Komjathy prior to the 10 day detail's expiration. Doc. Ent. 1-4 ¶ 136. On or about April 13, 2006, plaintiff kited the JMF Health Unit Manager Sherry, because he was out of pain medication again. Doc. Ent. 1-3 at 23-24; Doc. Ent. 1-3 ¶ 116; Doc. Ent. 1-3 at 35 (JMF-00737). On April 14, 2006, plaintiff went to the evening medication line, where he spoke with Nurse Michelle. Doc. Ent. 1-3 at 29 (JMF-00736). On April 18, 2006, plaintiff was informed that he was out of pain medication. Doc. Ent. 1-3 at 31 (JMF-00772); Doc. Ent. 1-3 ¶ 120. Plaintiff claims that Komjathy does not write pain

medication prescriptions until grievances are filed and calls are made. Doc .Ent. 1-3 ¶ 120. On April 19, 2006, plaintiff went to JMF Health Care to collect Trimble's April 13, 2006 prescriptions for Zofran and Compazine.[25] Doc. Ent. 1-3 at 30 (JMF-00771); Doc. Ent. 1-3 ¶ 121.

On June 16, 2006, plaintiff was transferred from JMF to ARF. On July 28, 2006, plaintiff was transferred from ARF to JMF. That evening, he was sent to the Duane Waters Hospital Emergency Room for a migraine headache. Doc. Ent. 1-3 ¶ 126; Doc. Ent. 104 ¶ 136.

According to plaintiff, he was written a prescription on or about August 7, 2006 for 6-Mercaptopurine (7 day dose) and Methotrexate (one 15mg dose for August 15th), but as of August 14, 2006, he had received neither. On or about August 20, 2006, plaintiff received the Methotrexate. During an August 21, 2006 visit, Trimble wrote plaintiff a prescription for Methotrexate to be taken on August 27, 2006; however, by August 28, 2006, plaintiff had not received it. Doc. Ent. 1-3 at 45; Doc. Ent. 1-3 ¶ 127; Doc. Ent. 1-3 at 32-33 (JMF-01692).

At the September 26, 2006 evening medication line, Nurse JoAnn only gave plaintiff some of his MS Contin and told him that his refill should be in the following afternoon. Doc. Ent. 1-4 at 6 (JMF-01932). According to Lesley Jones, "[t]he MS Contin medication ran out on the 9/27 evening pill line. The last pill was given to [plaintiff], his normal dosage being 3 pills (15 mg each) since there was only one pill left to give him. His prescribed dosage was not reduced, the medication ran out. The medication was re-ordered 9/27 and came from the DWH pharmacy on 9/28 but not in time for pill line, so [plaintiff] did not receive the medication until 9/29." Doc. Ent. 1-4 ¶ 137; Doc. Ent. 1-4 at 9 (JMF-01932). Plaintiff appears to allege that he received his Morphine

---

[25]Compazine is a "brand of prochlorperazine[.]" 47th Ed. Physicians' Desk Reference, 2291 (1993). Prochlorperazine is "[t]he generic name of a medicine used to check nausea and vomiting." Schmidt's Attorneys' Dictionary of Medicine, Volume 3, P-328 (1995).

because Axelson called the MDOC Medical Director.  Doc. Ent. 1-4 ¶ 134.  On October 1, 2006, plaintiff had been out of MS Contin since September 27, 2006.  Doc. Ent. 1-4 at 6-7.

On October 4, 2006, plaintiff had chemotherapy treatment with Axelson.  Doc. Ent. 1-4 at 15.  Plaintiff received the IV Chemotherapy Vinchristine.[26]  Ent. 1-4 ¶ 138.  He was supposed to take Prednisone from October 4, 2006 through October 12, 2006, "every 6 hours of the 7 days leading up to chemotherapy."  Doc. Ent. 1-4 at 15.  Plaintiff claims that the Prednisone was not provided in accordance with his oncologist's orders.  Ent. 1-4 ¶ 138; Doc. Ent. 1-4 at 15.  According to Leslie Jones, "[o]n the 10/04 visit, Dr[.] Axelson noted the medication was not in and requested follow-up."  Leslie Jones contends that plaintiff received the Prednisone on October 5, 2006.  Doc. Ent. 1-4 at 15.  Plaintiff claims he did not receive the medicine on October 5, 2006, as Lesley Jones claims.  Doc. Ent. 1-4 ¶ 140.  Plaintiff had chemotherapy treatment with Axelson again on October 11th and October 13th.  Doc. Ent. 1-4 at 15.

Plaintiff claims that on January 17, 2007, "Nurse Christina Stewart" informed him that "she had sent [his] restricted pain medication to another facility."  Doc. Ent. 1-4 ¶ 142; Doc. Ent. 1-4 at 24 (JMF-00242).  According to plaintiff, Christina *Perez* "continues to steal [his] narcotic medication."  Doc. Ent. 1-4 ¶ 142.

On January 23, 2007, Axelson wrote plaintiff two prescriptions - one for Triamcinolone[27] and one for Eucerin.  Doc. Ent. 1-4 at 21-22 (JMF-00274), Doc. Ent. 1-4 ¶ 141.  Plaintiff was scheduled to see Komjathy on February 1, 2007; however, Komjathy "stated that he had renewed

---

[26]"Oncovin® (Vinchristine Sulfate, USP, Lilly) is indicated in acute leukemia."  47th Ed. Physicians' Desk Reference, 1327 (1993).

[27]Triamcinolone is "[t]he generic name of a medicine used in the treatment of conditions marked by inflammation."  SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 4, T-161 (1995).

[plaintiff's] medication, taken care of [his] detail re: School examination, and therefore had no reason to see [plaintiff][.]" However, at the afternoon medication line, "the nurse told [plaintiff] [he] was out of MSIR." Doc. Ent. 1-4 at 18 (JMF-00273); Doc. Ent. 1-4 ¶ 136; Doc. Ent. 1-4 ¶ 143. On February 8, 2007, plaintiff's medical kite regarding Triamcinolone and Eucerin was returned to him, noting that the medications were awaiting approval. Doc. Ent. 1-4 ¶ 141. "[A]n appointment was re-scheduled for [February 14, 2007], which Dr. Komjathy again, refused to see [plaintiff]." Doc. Ent. 1-4 ¶ 144; Doc. Ent. 1-4 at 19 (JMF-00273). Plaintiff still did not have Triamcinolone and Eucerin on March 2, 2007. Doc. Ent. 1-4 ¶ 141.

On March 3, 2007, plaintiff's morphine was partially missing. Doc. Ent. 1-4 ¶ 145. Plaintiff was "supposed to receive 45 mg of MS Contin and 30 mg of MSIR (Immediate Release). All Nurse Evelyn gave [him] was the 45 mg-MS Contin." Doc. Ent. 37-8 at 5 (JMF-00465). At the afternoon medication line, "Nurse Evelyn told [plaintiff] Duane Waters was sending the MSIR over [to JMF], but [DWH] [does not] deliver until 4:30pm[.]" Doc. Ent. 37-8 at 6 (JMF-00465).

On March 22, 2007, Dr. Komjathy examined plaintiff "for chronic pain that was breaking through [his] current dosage of Morphine." Komjathy "acted as if he was unaware of the March 2006 MRI[.]" Doc. Ent. 1-4 ¶ 146; Doc. Ent. 1-4 ¶ 147; Doc .Ent. 1-4 ¶ 137; Doc. Ent. 1-4 ¶ 150. Komjathy thought the numbness in plaintiff's leg was related to his lumbar disc. Doc. Ent. 1-4 ¶ 151. Komjathy scheduled plaintiff for x-rays. Doc. Ent. 1-4 ¶ 147. Komjathy told plaintiff "he was writing a prescription for [plaintiff's] MSIR to be increased in the morning and for [his] MS-Contin to be increased in the evening." Doc. Etn. 1-4 ¶ 152.

Trimble wrote plaintiff a prescription to take 6-Mercaptopurine on March 28, 2007. Doc. Ent. 1-4 ¶ 149. On April 2, 2007, LPN Stacy Baker informed plaintiff that his MSIR was out, and

the evening medication line nurse told him that he was running out of MS Contin. On April 3, 2007, Baker informed plaintiff that he was out of morphine. Doc. Ent. 1-4 ¶ 153. Plaintiff contends that if Komjathy had ordered plaintiff's medication on March 22, 2007, he would not have been told these things. Doc. Ent. 1-4 ¶ 153. Plaintiff also claims that if the medication had been sent on March 22, 2007, he would have received it by April 2, 2007. Doc. Ent. 1-4 ¶ 154.

**b.** Plaintiff's complaint, defendants' motion and plaintiff's response contain evidence of several JMF grievances. Attached to plaintiff's complaint are thirteen (13) JMF grievances: Nos. 00116, 00736, 00771, 00772, 01692, 00773, 00737, 01849, 01932, 01933, 00273, 00274, 00242.

A comprehensive list of plaintiff's JMF grievances can be found on the Prisoner Grievance Summary Report (dated October 3, 2007).[28] According to that report, plaintiff submitted forty-two (42) Step I grievances, received between December 13, 2005 and July 24, 2007. Fifteen (15) of these Step I JMF grievances were appealed to Step II. Doc. Ent. 37-7 at 6-7. These grievances are emphasized below in bold. Furthermore, only four JMF grievances were appealed to Step III. Doc. Entries 37-5 and 37-7 at 6-7. Those grievances are emphasized below in italics:

> 1. JMF-06-01-00116-12f3: On January 16, 2006, plaintiff completed a Step I grievance form based upon the fact that he was out of MS Contin on January 13, 2006. Glasper's January 19, 2006 response, reviewed the same day by Hammond, states, "[g]rievant has medication order today [g]rievant states considers grievance resolved[.]" Doc. Ent. 1-3 at 16.

> 2. **JMF-06-01-00176-09d:** This grievance was originally submitted on or about January 24, 2006. It was received at Step II on February 22, 2006 and was denied. Doc. Ent. 37-7 at 6.

> 3. JMF-06-02-00440-12f3: On or about February 28, 2006, plaintiff completed a Step I grievance form based upon his February 17, 2006 visit to the restricted medication line. Glasper's April 6, 2006 response, reviewed by Debbie Roth on

---

[28]This report was maintained by McMillan. Doc. Ent. 37-7 at 4 ¶ 10.

April 18, 2006, states that plaintiff "states that it is resolved." Doc. Ent. 37-7 at 10-15.[29]

4.　　Grievances JMF-06-04-00736-12d3 (Doc. Ent. 1-3 at 29; Doc. Ent. 37-7 at 16-17); JMF-06-04-00737-12d1 (Doc. Ent. 1-3 at 35; Doc. Ent. 37-7 at 18-19); JMF-06-04-00771-12d3 (Doc. Ent. 1-3 at 30; Doc. Ent. 37-7 at 20-21); JMF-06-04-00772-12d3 (Doc. Ent. 1-3 at 31; Doc. Ent. 37-7 at 22-23); JMF-06-04-00773-12e4 (Doc. Ent. 1-3 at 34; Doc. Ent. 37-7 at 24-25) were received at Step I during April 2006. Kisner responded to each of them on May 18, 2006. These five grievances were not appealed to Step II. Doc. Ent. 37-7 at 6.[30]

5.　　**JMF-06-08-01692-12d3:** On August 28, 2006, plaintiff completed a Step I grievance appeal form regarding Roth, Glasper and Brandi based upon his prescriptions to take medicine on August 14th and August 27th. Stuparek's February 20, 2007 Step I response, reviewed by T. Arnold on February 21, 2007, states that "[p]er Pharmacorr they did not receive any orders from oncologist for Methotrexate to be given on 08/14/06 or 08/27/06." Doc. Ent. 1-3 at 32-33, Doc. Ent.1-3 at 45-48. It was appealed to Step II on March 2, 2007,[31] and was received on March 6, 2007. The Step II grievance appeal was denied. Grievance **JMF-06-08–01693-12e4** was received at Step I on August 29, 1996 and was denied. It was received at Step II on March 16, 2007, and was denied. Doc. Ent. 37-7 at 6.

6.　　*JMF-06-09-01849-12z*: This grievance was received at Step I on or about September 21, 2006. Apparently, it was filed "against JMF Warden Sherry Burt for failing to compel Grievance Coordinator Larry McMillan to cease and desist from interfering with [plaintiff's] ability to exhaust [his] administrative remedies against

---

[29]Plaintiff's February 18, 2006 Step I grievance based upon a February 17, 2006 incident was returned to him because it contained prohibited language. Doc. Ent. 37-7 at 8-9. On February 24, 2006, plaintiff wrote to Burt (regarding McMillan's February 23, 2006 rejection of plaintiff's grievance). Doc. Ent. 1-3 at 17-19; Doc. Ent. 1-3 ¶ 113.

[30]In a May 23, 2006 letter to the Region III Jackson Medical Complex, which accompanied one Step II grievance appeal form regarding five JMF grievances (0771, 0773, 0772, 0736 and 0737), plaintiff accuses McMillan of "refusing to provide 2nd Step Appeal forms." Doc. Ent. 1-3 at 40-41; Doc. Ent. 1-3 at 43; Doc. Ent. 1-3 ¶ 123. Plaintiff sent the same material to the Step II grievance appeal respondent. Doc. Ent. 1-3 ¶ 124.

Plaintiff contends that Regional Health "responded via a Memorandum telling [plaintiff] to proceed through the grievance procedure." Doc. Ent. 1-3 ¶ 123. By a memorandum dated June 6, 2006, Alfred Jones informed plaintiff that his Step II grievance was being returned to him so that plaintiff could process it though JMF's grievance coordinator. Doc. Ent. 1-3 at 42; Doc. Ent. 1-3 ¶ 124.

[31]*See* Doc. Ent. 1-3 ¶ 130.

JMF Health Care Personnel[,]" and because plaintiff was seeking to have his oncologists' orders followed. It was received at Step II on or about November 15, 2006. On December 11, 2006, Alfred Jones considered the grievance appeal denied. It was appealed to Step III and was received on December 20, 2006. The Step III grievance appeal was denied. Doc. Ent. 1-4 at 3-5; Doc. Ent. 37-5 at 3; Doc. Ent. 37-7 at 6.[32]

7.    **JMF-06-10-01932-12f3**: This grievance was written on October 1, 2006, received at Step I on October 3, 2006, and appears to have been based upon a September 27, 2006 date of incident. Plaintiff contends it was written against Glasper and Joyce Kisner.[33]  Although it is difficult to read, Alfred Jones's November 3, 2006 response claims that Mr. Davis "alleged he had been out of MS Contin since 9-27-06 and his dosage had been cut from 45mg to 15mg." Jones summarized that "[a]ppropriate medical treatment was provided for grievant's health care issue." Plaintiff appealed the grievance to Step II on November 16, 2006. Lesley Jones responded to the grievance appeal on December 14, 2006.[34]  The appeal was received at Step III on January 8, 2007, and it was denied. Doc. Ent. 1-4 at 6-9; Doc. Ent. 37-5 at 3.

---

[32]On or about May 17, 2006, plaintiff filed a grievance directly to Step III. In part, it stated that "[t]his is a grievance against JMF Warden Sherry Burt for failing to compel Grievance Coordinator Larry McMillan to cease and desist from interfering with my ability to exhaust my administrative remedies against JMF Health Care personnel." Plaintiff also mentions that he is "simply trying to [ensure] that [his] . . . Oncologist[s'] orders are followed[.]" It was received on May 26, 2006. Doc. Ent. 1-3 ¶ 125; Doc. Ent. 1-4 at 3 (JMF 189922, 11g); Doc. Ent. 37-5. In a letter dated May 30, 2006, James Armstrong, Manager Prisoner Affairs, informed plaintiff that his grievance may be processed to Step I. Doc. Ent. 1-3 at 28. Plaintiff claims he did so but received no response. Doc. Ent. 1-3 ¶ 125.

On September 17, 2006, plaintiff resubmitted his grievance directly to Step III. Doc. Ent. 1-4 ¶ 132. It was assigned number 195153 on September 21, 2006. Doc. Ent. 37-5 at 3. In a letter dated September 21, 2006, Armstrong informed plaintiff that his grievance may be processed to Step I. Doc. Ent. 1-4 at 2. Apparently, it became JMF-1849 when it was received at Step I on September 21, 2006. Doc. Ent. 1-4 ¶ 133; Doc. Ent. 37-7 at 6. Plaintiff claims there has been no response to this grievance. Doc. Ent. 1-4 ¶ 133.

[33]*See* Doc. Ent. 1-4 ¶ 135.

[34]A. Jones's November 3, 2006 Step I response and L. Jones's December 14, 2006 Step II response give different explanations. Doc. Ent. 1-4 at 7, Doc. Ent. 1-4 at 9. Plaintiff claims he was not seen by a medical service provider. Doc. Ent. 1-4 ¶ 136. According to plaintiff, L. Jones's response was wrong, although "close to the truth than Alfred Jones." Plaintiff contends that "[i]n order for [him] to have one(1) pill remaining would mean that a JMF Health Care worker either took the medication themselves, or otherwise utilized it in some other illegal manner." Doc. Ent. 1-4 ¶ 137.

8. ***JMF-06-10-01933-12d3***: This grievance was written on October 1, 2006, received at Step I on October 3, 2006, and appears to have been based upon a September 27, 2006 date of incident; however, it is difficult to read. According to plaintiff, the grievance concerns "the failure of JMF Medical Personnel, Dr. David Komhjathy, Nurse Supervisor Betty Glasper, et. al, to fill the order of my Oncologist for "Prednisone[.]"[35] According to Jones's November 3, 2006 response, the Step I grievance alleges that "JMF Medical Staff refused to give Mr. Davis his prescribed Prednisone." The response further states that "[a]ccording to JMF Medical Staff, Mr. Davis was prescribed Prednisone from 10-4-06 to 10-12-06." On November 16, 2006, plaintiff appealed the grievance to Step II. It was received at Step II on November 20, 2006. Lesley Jones responded to the grievance on December 14, 2006. The grievance was appealed to Step III, was received on January 10, 2007, and was denied. Doc. Ent. 1-4 at 12-16; Doc. Ent. 37-5 at 3; Doc. Ent. 37-7 at 6.

9. ***JMF-06-10-02162-02z***: Plaintiff completed this grievance on or about October 24, 2006. It was received at Step II on December 4, 2006. It was denied at Step III. Doc. Ent. 37-5; Doc. Ent. 37-7.

10. **JMF-07-01-00242-12e4:** On January 26, 2007, plaintiff completed a Step I grievance form regarding a January 17, 2007 incident. Although it is difficult to read, the Step I response summary of complaint states, "Grievant's complaint is he alleges Nurse Christine stole or misplaced [his] morphine medication. Complaints that health care staff member mistreated him on 01/17/07[.]" Stuparek's February 20, 2007 response, reviewed by T. Arnold on February 21, 2007, summarizes that "health care staff member who is being grieved not working at JMF on the date of incident." Plaintiff appealed the grievance to Step II on March 2, 2007. Doc. Ent. 1-4 at 24-26. According to McMillan's report, it was denied at Step II. Doc. Ent. 37-7 at 6.

11. **JMF-07-02-00273-12f4:** On February 1, 2007, plaintiff completed a grievance regarding Komjathy's cancellation of plaintiff's same-day appointment. Stuparek's February 20, 2007 response, reviewed by T. Arnold on February 21, 2007, states that the "appointment was cancelled due to emergency count. Appointment was rescheduled 02/14/07[.]" Plaintiff completed a Step II grievance appeal on or about March 8, 2007. Doc. Ent. 1-4 at 18-20; Doc. Ent. 1-4 ¶ 144. According to McMillan's report, it was received at Step II on March 9, 2007, where it was denied. Doc. Ent. 37-7 at 6

12. **JMF-07-02-00274-12d4:** On February 1, 2007, plaintiff completed a grievance regarding his January 23, 2007 prescriptions from Axelson. Stuparek's February 20, 2007 Step I response, reviewed by T. Arnold on February 21, 2007,

---

[35]*See* Doc. Ent. 1-4 ¶ 138.

states that "Triamcin[o]lone and Eucercin creams ordered by MSP on 02/08/07." Plaintiff completed a Step II grievance appeal on March 2, 2007. Doc. Ent. 1-4 at 21-23. According to McMillan's report, it was received at Step II on March 6, 2007, where it was denied. Doc. Ent. 37-7 at 6.

13.     **JMF-07-03-00465-12f4:** Plaintiff completed a grievance form on March 4, 2007 against Nurse Evelyn and Dr. David Komjathy regarding a March 3, 2007 incident. Stuparek interviewed plaintiff on March 20, 2007.[36] Stuparek's response was reviewed by Carol Griffes on March 30, 2007. Plaintiff completed a Step II appeal on April 17, 2007. It was received at Step II on April 19, 2007. Alfred Jones's June 12, 2007 response deems the grievance resolved. Doc. Ent. 37-8 at 4-9.

14.     According to McMillan's report, grievances **JMF-07-04-00680-12f4; JMF-07-04-00760-12d4; JMF-07-04-00766-12f4**; and **JMF-07-04-00767-12e4**, were received at Step I during April 2007 and were received at Step II during May 2007. Each of them was denied. Doc. Ent. 37-7 at 7.[37]

Plaintiff's complaint (dated April 19, 2007) asserts that he has not received Step III responses while at JMF, even though he submitted Step III Grievance Appeals as early as February 2006. Doc. Ent. 1-3 ¶ 103. This is not entirely consistent with the October 3, 2007 JMF Prisoner Grievance Summary Report (which shows that plaintiff's four Step III responses were received on April 26, 2007 and May 1, 2007) or with the Step III Grievance Inquiry (which shows that these grievances were received at Step III in December 2006 or January 2007 and were returned to the grievant in April 2007 (on days which post-date the filing of this complaint). Doc. Ent. 37-5 at 3; Doc. Ent. 37-7 at 6.

---

[36]Plaintiff claims that when he "was first called out to be interviewed . . . [Stuparek] told [him] the reason [he] was not being called out by a doctor was because Dr. Komjathy was on vacation[.]" Doc. Ent. 1-4 ¶ 146.

[37]Perhaps these encompass the two grievances referred to in ¶ 149 and ¶ 150 of plaintiff's complaint. Plaintiff claims he wrote a grievance on March 30, 2007 regarding 6-Mercaptopurine he was supposed to take on March 28, 2007. Plaintiff also claims he wrote a grievance on April 3, 2007 against Komjathy and Griffes regarding JMF-00465. Doc. Ent. 1-4 ¶¶ 149, 150. Perhaps this grievance concerned Griffes March 30, 2007 review of Stuparek's March 20, 2007 Step I grievance response. Doc. Ent. 37-8 (JMF-00465).

**c.**     Defendants argue that defendants Burt, McMillan, Stuparek, Roth and Perez "are entitled to summary judgment and dismissal due to their lack of personal involvement in the matters alleged, and because there is no genuine issue of material fact regarding their liability."  Doc. Ent. 37 at 18-23.  Defendants contend:

> It is evident from Plaintiff's Complaint and grievances that there were some problems in Pharmacorr getting medication orders from Plaintiff's oncologists on more than one occasion.  However, there is no evidence indicating that Defendants Roth, Burt, McMillan, or Stuparek had anything to do with the transmission of those prescription orders from the oncologist to Pharmacorr."  When Plaintiff filed a grievance, as he should do when problems arise, the matters were looked into and resolved.

Doc. Ent. 37 at 20.  Defendants also contend that "[t]he claims against defendants Burt, McMillan, Roth, and Stuparek are based on their processing and/or responding or not responding to grievances or correspondence[,]" and "Plaintiff has not shown that defendants Burt or Roth failed to discharge their supervisory duties merely because they did not resolve his grievance to his satisfaction."  Doc. Ent. 37 at 21.

Plaintiff's response with respect to his JMF claims only mentions Roth and Stuparek.  Doc. Etn. 56 at 10-11.  Defendants' reply that "[p]laintiff did not respond to the motion arguments of Defendants Burt, McMillan, Roth, Stuparek and Perez; therefore the Court should grant summary judgment in their favor."  Doc. Ent. 69 at 8.  Defendants further reply that "Caruso and Burt are entitled to summary judgment because they had no personal involvement in Plaintiff's medical care or treatment."  Doc. Ent. 69 at 8.

**d.**     McMillan is a Corrections Resident Representative (Grievance Coordinator) at JMF.  Doc. Ent. 37-7 at 2 ¶ 1.  Plaintiff claims that McMillan "has been instrumental in employing every

dilatory tactic known through the MDOC, where not filing grievances [is] concerned." Doc. Ent. 1-3 ¶ 103.

On February 23, 2006, McMillan returned plaintiff's February 18, 2006 grievance (regarding plaintiff's February 17, 2006 visit to the medication line) on the basis that it contained prohibited language. Doc. Ent. 37-7 at 8-9. Plaintiff wrote to Burt on February 24, 2006 about McMillan. Doc. Ent. 1-3 ¶ 113. It appears that this grievance became JMF-00440 on February 28, 2006. Doc. Ent. 37-7 at 10-15. Glasper's April 6, 2006 grievance response states, "[t]he gr[ie]vant states that it is resolved." Doc. Ent. 37-7 at 15. According to McMillan's report, this grievance was not appealed to Step II. Doc. Ent. 37-7 at 6.

Plaintiff claims that, even though plaintiff repeatedly kited, McMillan never sent plaintiff a copy of a Step II grievance appeal form for JMF-00737, which Nurse J. Kisner had responded to on May 18, 2006. Doc. Ent. 1-3 ¶ 118; Doc. Ent. 37-7 at 19 (JMF-00737). Plaintiff claims there are five (5) grievances regarding which McMillan did not sent plaintiff Step II grievance appeal forms. Doc. Ent. 1-3 ¶ 119. These appear to have been grievances JMF grievances (0771, 0773, 0772, 0736 and 0737) which were received at Step I during April 2006 and were responded to on May 18, 2006. Doc. Ent. 37-7 at 6; Doc. Ent. 37-7 at 17, 19, 21, 23, 25.

In plaintiff's May 23, 2006 letter to Regional Health - Jackson Medical Complex regarding a single Step II appeal for five JMF grievances (0771, 0773, 0772, 0736 and 0737), plaintiff stated that he "spoke directly to Mr. McMillan and requested that he desist interfering with [plaintiff's] ability to exhaust [his] administrative remedies regarding [plaintiff's] medical issues[,]" and contends that McMillan is "effectively blocking [hi]s ability to exhaust [his] grievances[.]" Plaintiff mentions McMillan's refusal to provide Step II grievance appeal forms and contends that "[i]t is not

in Mr. McMillan's discretion to extend the time limit on the grievance procedure simply because he has a personal interest in someone at JMF Health Care whose name appears in my grievances." Doc. Ent. 1-3 at 40; Doc. Ent. 1-3 ¶ 123. According to plaintiff, his May 24, 2006 Step III grievance (189922) concerned McMillan's failure to send plaintiff Step II grievance appeal forms. Doc. Ent. 1-3 ¶ 125. As previously mentioned, Armstrong returned the grievance to plaintiff on or about May 30, 2006 with directions to process it at Step I. Doc. Ent. 1-3 at 28. Plaintiff claims he did so but received no response. Doc. Ent. 1-3 ¶ 125.

These grievances had also been sent to the Step II respondent. Doc. Ent. 1-3 ¶ 124. In a June 6, 2006 letter, Alfred Jones returned plaintiff's Step II grievance and instructed him to process it through the proper channels. Doc. Ent. 1-3 at 42.

On September 11, 2006, plaintiff kited McMillan regarding plaintiff's request for grievance appeal forms on five (5) JMF grievances (0771, 0773, 0772, 0736 and 0737). Plaintiff referred to a conversation in which McMillan allegedly told plaintiff the appeal forms had been sent and informed McMillan that he (plaintiff) had not received them. Plaintiff also inquired about the processing of the direct Step III grievance that had been returned to plaintiff (perhaps 189922) and that plaintiff had sent to McMillan as a Step I grievance. Doc. Ent. 1-3 at 50; Doc. Ent. 1-3 ¶ 131. Plaintiff claims that McMillan did not respond to this kite. Doc. Ent. 1-4 ¶ 132. Plaintiff resent the grievance on September 17, 2006, and it was assigned Step III ID 195153 on September 21, 2006. Doc. Ent. 1-4 ¶ 132; Doc. Ent. 37-5 at 3.

Perhaps referring to plaintiff's May 26, 2006 (189922) and September 21, 2006 (195153) direct Step III grievances, plaintiff claims "it took [him] writing 3rd Step twice, for the Grievance Coordinator to begin sending [plaintiff] 2nd Step grievances upon request." Doc. Ent. 1-3 ¶ 124. In

essence, plaintiff's effort to file JMF-1849 began on May 17, 2006 and was successful on September 21, 2006.

Additionally, plaintiff appears to suggest that his March 2, 2007 appeal of the February 20-21, 2007 response to plaintiff's August 28, 2006 Step I grievance (JMF-01692) is due to the fact that when he goes around McMillan to Step II the grievances are not accepted. Doc. Ent. 1-3 ¶ 130.

Defendants argue that "McMillan denies any wrongdoing in the handling of grievances filed by Plaintiff." Doc. Ent. 37 at 18. In response to ¶ 104, McMillan states that he has "not used any 'dilatory tactics'; [he has] provided everything that prisoner Davis has requested in accordance with PD 03.02.130." Doc. Ent. 37-7 at 2 ¶ 4. Acknowledging plaintiff's February 24, 2006 letter to Burt (regarding McMillan's February 23, 2006 rejection of plaintiff's grievance), McMillan argues that he has "not interfered with [plaintiff's] ability to properly file a grievance." Doc. Ent. 1-3 ¶ 113; Doc. Ent. 37-7 at 2-3 ¶ 5.

In response to plaintiff's allegation that, although plaintiff repeatedly kited, "McMillan never sent [plaintiff] a 2nd Step Appeal form [JMF-00737][,]" Doc. Ent. 1-3 ¶ 118, McMillan states, "[t]his is true - I did not provide a Step II appeal form because I never received a request from him for a Step II appeal form for [JMF-00737][.]" Doc. Ent. 37-7 at 3 ¶ 7. In response to plaintiff's allegations that "[t]here are 5 grievances . . . that Mr. McMillan never supplied 2nd Step Appeal forms for[,]" Doc. Ent. 1-3 ¶ 119, McMillan states that he "provided a Step II appeal form for every grievance tracking number that he requested an appeal form for." Doc. Etn. 37-7 at 3 ¶ 8. Acknowledging plaintiff's allegations regarding plaintiff's May 26, 2006 letter and Jones's June 6, 2006 letter, McMillan claims that "if [he] received a proper request for a Step II appeal form [he] provided it to prisoner Davis." Doc. Ent. 37-7 at 3-4 ¶ 9; Doc. Ent. 1-3 ¶¶ 123-124.

McMillan claims that plaintiff's "Prisoner Grievance Summary Report" "shows that for these five listed grievances [he] did not get a Step II appeal form request or appeal." Doc. Ent. 37-7 at 4 ¶ 10. In support of this statement, McMillan provides his October 3, 2007 report of plaintiff's JMF grievances, which shows that Step II appeals were not received on these five grievances. Doc. Ent. 37-7 at 6. McMillan claims that "[a]dditional computer records show that for these five grievances, no appeal form was requested and therefore not sent." Doc. Ent. 37-7 at 4 ¶ 11. In support of this statement, McMillan provides five printouts which each show that no appeal form was sent. Doc. Ent. 37-7 at 16, 18, 20, 22, 24.

Defendants argue that "there is no evidence indicating that . . . McMillan . . . had anything to do with the transmission of those prescription orders from the oncologist to Pharmacorr. When Plaintiff filed a grievance, as he should do when problems arise, the matters were looked into and resolved." Doc Ent. 37 at 20. Furthermore, defendants contend that "[t]he claims against . . . McMillan . . . are based on [his] processing and/or responding or not responding to grievances or correspondence." Doc. Etn. 37 at 21.

It is true that, in response to defendants' JMF arguments, plaintiff does not specifically mention McMillan. Doc. Ent. 56 at 10-11. As defendants state in reply, plaintiff did not respond to the arguments regarding McMillan. Doc. Ent. 69 at 8. Nonetheless, having considered the claims made in plaintiff's complaint and the arguments made in defendants' motion, the Court should conclude that McMillian is not entitled to summary judgment on all of plaintiff's claims against him.

First, to the extent plaintiff's claims that McMillan has interfered with plaintiff's efforts to file grievances and/or appeals (¶ 103) is based upon McMillan's February 23, 2006 rejection of

plaintiff's February 18, 2006 grievance (about plaintiff's February 17, 2006 visit to the medication line) on the basis that plaintiff used prohibited language (¶ 113), plaintiff's claim does not survive summary judgment. *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999). Plaintiff contends that McMillan is not qualified to review medical care grievances (¶ 113). Plaintiff's February 24, 2006 letter to Warden Burt claims that McMillan should not have required plaintiff to resubmit the grievance, the February 23rd rejection prevented plaintiff from receiving his prescription, McMillan has interfered with plaintiff's ability to address his problem, and McMillan has "added at least 1 week onto [plaintiff's] pain and suffering." Doc. Etn. 1-3 at 18-19. These claims simply question McMillan's rejection of the grievance. Furthermore, plaintiff's complaint became grievance JMF-00440 on February 28, 2006 (Doc. Etn. 37-7 at 10-1), so there does not appear to have been a delay on McMillan's part in reprocessing the redrafted grievance. Additionally, as McMillan explains:

> On February 23, 2006, I returned a grievance to [plaintiff] in accordance with PD 03.02.130(G), which describes rejection of irresponsible and improper grievances. . . . When prisoner Davis rewrote the grievance without the prohibited language and resubmitted it, I processed the grievance with tracking number JMF 06.02-440-12F3, on February 28, 2006.

Doc. Ent. 37-7 at 3 ¶ 6; Doc. Ent. 37-7 at 8-9. Therefore, to the extent plaintiff's claims against McMillan are based upon the February 23, 2006 rejection (Doc. Ent. 1-3 ¶ 113), defendant is entitled to summary judgment.

Second, to the extent plaintiff's claims are based upon McMillan's failure to provide Step II grievance appeal forms for JMF-00736, JMF-00737, JMF-00771, JMF-00772 and JMF-00773 (¶ 118, ¶ 119, ¶ 123, ¶ 124, ¶ 131), defendant McMillan is not entitled to summary judgment. First, while defendants' printouts indicate that appeal forms were not sent for JMF-00736, JMF-00737, JMF-00771, JMF-00772 and JMF-00773, the printouts do not indicate whether an appeal form was

requested.  Doc. Ent. 37-7 at 16, 18, 20, 22, 24.  Second, with respect to these same five grievances, defendants do not address plaintiffs' September 11, 2006 request for the five Step II grievance appeal forms.  In fact, plaintiff claims that McMillan did not respond.  Doc. Ent. 1-3 ¶ 131.

Third, to the extent plaintiff alleges that McMillan played a part in the delay of his August 28, 2006 Step I grievance (JMF-01692), which was not responded to until February 2007, this is a conclusory allegation (¶ 130).  *McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1162 (6th Cir. 1990) ("mere conclusory allegations are not sufficient to withstand a motion for summary judgment.").  McMillan would be entitled to summary judgment on any such claim.

Fourth, it is not clear that McMillan is not responsible for the apparently delayed reprocessing of plaintiff's direct Step III grievance which was originally dated May 17, 2006 which ultimately became JMF-01849 on September 21, 2006.  The September 11, 2006 kite to McMillan in part sought the status of processing the Step I grievance that had been returned to plaintiff from Step III (presumably 189922 received at Step III on May 26, 2006).  Plaintiff stated, "I sent you a 1st Step grievance that I sent <u>directly</u> to the 3rd Step. . . . I sent it to you as directed and heard nothing from you re: it.  Are you not going to process it?"  Doc. Ent. 1-3 at 50.  As noted above, plaintiff later resent his grievance to Step III (195153) where it was received on September 21, 2006.  Doc. Ent. 37-5 at 3.  According to McMillan's report, it was accepted as JMF-01849.  Doc. Ent. 37-7 at 6.  To the extent plaintiff contends that McMillan was responsible for the fact that the reprocessing of 189922 to Step I had not been handled sooner (¶ 125, ¶ 131), McMillan is not entitled to summary judgment.[38]  As previously noted, plaintiff claims that McMillan did not respond to the September 11, 2006 kite.  Doc. Ent. 1-3 ¶ 132.

---

[38]It is not clear who provided the Step I response to JMF-1849.  Doc. Ent. 1-4 at 3-5.

**e.**      Stuparek is a Department Analyst at JMF. Doc. Ent. 37-8 at 2 ¶ 1. He "investigated those grievances filed at JMF that involved prisoner access to health care." Doc. Ent. 37-8 at 2 ¶ 3. Incidentally, Stuparek is a Registered Nurse. Doc. Ent. 37-8 at 3, 4.

Plaintiff alleges that Stuparek and Arnold, the respondent and reviewer of the Step I grievance response in JMF-01692, "placed the blame for me not receiving the Methotrexate [on August 15th] on the CMS contracted PharmCorr." Doc. Ent. 1-3 ¶ 129. Plaintiff appears to suggest that the February 20-21, 2007 response to his August 28, 2006 Step I grievance, was the reason his Step II grievance appeal of JMF-01692 was sent on March 2, 2007. Doc. Ent. 1-3 ¶ 130. Plaintiff also notes that Stuparek's February 20, 2007 Step I response states that "Triamcin[o]lone and Eucerin creams [were] ordered by MSP on 02/08/07." Doc. Ent. 1-4 at 22 (JMF-00274). Furthermore, plaintiff alleges that if Stuparek had "been seeking to resolve a grievance rather than cover for medical care employee misconduct he would have made the correction [in JMF-00242, wherein plaintiff named Christina Stewart and not Christina Perez]." Doc. Ent. 1-4 ¶ 142. Plaintiff points out that in a March 2007 Step I grievance response, reviewed by Griffes, Stuparek stated, "You had an MSP appt on 3/22/07 with the medications being reordered at the same dosages." Doc. Ent. 37-8 at 7 (JMF-00465); Doc. Ent. 1-4 ¶ 153.

In their motion, defendants note Stuparek's Step I response to JMF-1692. Doc. Ent. 37 at 20. In his November 29, 2007 affidavit, Michael Stuparek stated that in ¶ 129 of the complaint, "Davis alleges that Nurse Supervisor Terry Arnold and I blamed him for not receiving the medication Methotrexate.[39] This is not true. I never made any such accusations against prisoner

---

[39]This seems to be a mischaracterization of ¶ 129, where plaintiff alleges that Stuparek and Arnold placed the blame on PharmCorr. Doc. Etn. 1-3 ¶ 129.

Davis. Medications are ordered by the specialist and the JMF medical practitioner." Doc. Ent. 37-8 at 2 ¶ 4. Also, Stuparek states in response to ¶ 153 of the complaint, "This is correct. I wrote that sentence as part of a grievance response to JMF 07-06-465-12F4[.]" Doc. Ent. 37-8 at 3 ¶ 5.

Plaintiff's response to the JMF claims mentions Roth and Stuparek, but only specifically discusses Roth. Doc. Ent. 56 at 10-11. As a result, defendants are correct in noting that plaintiff's response does not address Stuparek's motion arguments. Doc. Ent. 69 at 8. In any event, it is clear that Stuparek provided the February 20, 2007 responses to JMF-01692, JMF-00242, 00273 and 00274. He also conducted the March 20, 2007 interview and provided the same-day response on JMF-00465. Doc. Etn. 37-8 at 5, 7. To the extent plaintiff's claims against Stuparek are related to the "blame-shifting" in the response to JMF-01692 (¶ 129), his handling of the response to JMF-00242 (¶ 142), or the veracity of his statement to plaintiff during the March 20, 2007 interview regarding or the veracity of his response to JMF-00465 (¶¶ 146, 153), the Court should agree with defendants that "there is no evidence indicating that . . . Stuparek had anything to do with the transmission of those prescription orders from the oncologist to Pharmacorr[,]" Doc. Ent. 37 at 20, and that plaintiff's claims against defendant Stuparek are based upon his "processing and/or responding or not responding to grievances or correspondence." Doc. Ent. 37 at 21. Accordingly, the Court should dismiss plaintiff's claims against Stuparek.

**f.**     Roth is described as a Director of Nursing (DON). Doc. Ent.1 at 2 ¶ 3; Doc. Ent. 37 at 18. Plaintiff wrote to Roth on May 21, 2006 regarding a failure to follow Mich. Comp. Laws § 333.16221 ("Investigation of licensee; grounds") and MDOC PD 03.04.100 ("Health Services"). Within this letter, plaintiff claims to have previously written informal letters to Roth April 13, 2006 and April 19, 2006. Doc. Ent. 1-3 at 37-38. Roth responded that plaintiff's "MSP wrote the orders

to refill [his] MS Contin & MSIR on 5/22/06[.] Your current order was due to expire on 5/28/06. If the pharmacy sends your meds as ordered you should not have a lapse in medication." Doc. Ent. 1-3 at 37-38; Doc. Ent. 1-3 ¶ 122.

Plaintiff claims he had numerous contacts with Roth "regarding the filling of prescriptions written by [his] Oncologist[s]." Doc. Ent. 1-3 ¶ 127. On August 28, 2006, plaintiff filed JMF-01692 against Roth, Glasper and Brandi. Doc. Ent. 1-3 at 32-33, 45-48. According to the complaint, this grievance concerned "the failure to fill the Oncologist[s] prescribed 6-Mercaptopurine on August 7, 2006 to be taken for 7 days and one dose of Methotrexate 15 mg to be taken August 15, 2006." As of August 28, 2006, plaintiff "had not received either doses of the chemotherapy medications." Doc. Etn. 1-3 ¶ 127.

In part, the grievance states that Roth "has failed to . . . properly supervise and train her subordinates[.]" Plaintiff also refers to the JMF medical personnel as being "under the auspices of [Roth and Glasper]." Plaintiff claimed that "[b]y refusing, intentionally disregarding and maliciously failing to fill prescriptions written to fight [his] cancer . . . Roth is taking an active and assertive role in assassinating me . . . through inaction." He contends that before his transfer to ARF, Roth and Glasper "were just disregarding [his] pain management issues." Now, he contends, "they are disregarding [his] LIFE." Doc. Ent. 1-3 at 46. Stuparek's response states that "orders were written for Methotrexate to be given on 08/14/06 and 08/27/06 by the oncologist but were not received or dispensed by Pharmacorr." Doc. Ent. 1-3 at 47.

In his complaint, plaintiff alleges that "JMF Health Care declined 'rapidly' under H.U.M. Roth, yet she received a promotion and [he] received nothing." According to plaintiff:

> No, change in my narcotic pain medication Morphine coming up missing, not being renewed in a manner preventing unnecessary pain and suffering due to my

medication getting stolen or otherwise coming up missing. As a matter of fact, though Ms. Roth sought to place blame on the pharmacy, [he] had more instances of [his] pain medication disappearing while Ms. Roth was here, than when she was not. Then, it was monthly. Under Ms. Roth, again a nurse interjecting her opinion that I should not get MSIR, though it was my Oncologist[s] who prescribed the MSIR. When my Oncologist[s] have called the facility about me not getting my pain medication, JMF Medical Personnel go pick the pain medication up. It is the responsibility of JMF Health Unit Manager and Nurse Supervisors' to ensure I have the medications ordered by my Oncologists. I have nothing to do with anything except receiving the medications as ordered.

Doc. Ent. 1-3 ¶ 122.

In their motion, defendants argue that "there is no evidence indicating that . . . Roth . . . had anything to do with the transmission of those prescription orders from the oncologist to Pharmacorr." Doc. Ent. 37 at 20. Defendants also argue that "[t]he claims against . . . Roth . . . are based on [her] processing and/or responding or not responding to grievances or correspondence." Finally, defendants state that "[p]laintiff has not shown that . . . Roth . . . failed to discharge [her] supervisory duties merely because [she] did not resolve [plaintiff's] grievance to his satisfaction." Doc. Ent. 37 at 21.

Plaintiff claims that "Roth responded to [the May 21, 2006] complaint the Plaintiff wrote her[,]" which "constitutes personal involvement that does not have to be inferred from [Cohen's July 7, 2004 report]." Plaintiff's citation to *Risbridger v. Connelly*, 122 F.Supp.2d 857, 869 (W.D. Mich. 2000), *reversed and remanded* 275 F.3d 565 (6th Cir. 2002), suggests that plaintiff's claim against Roth is based at least in part upon supervisory liability. Doc. Ent. 56 at 11.

It is plaintiff's position that medical specialists "send prescriptions back to the facility to be ordered from PharmCorr by the MSP at the facility." Doc. Ent. 56 at 11. In support of this statement, he cites Cohen's report, which states in part that "[m]edication orders are reviewed and transmitted to the pharmacy by nursing, and medications are distributed by nurses." Doc. Ent. 56

at 17. Plaintiff states that his claims that "Roth had everything to do with submitting the prescription orders to an MSP when Plaintiff returned from an appointment[,]" and "she failed to properly supervise and institute procedures that would ensure problems getting Specialist prescribed medications including chemotherapy medications and pain medication[,]" "have nothing to do with the resolution of grievances." Doc. Ent. 1-3 ¶ 122; Doc. Ent. 56 at 11.

Plaintiff has provided a copy of Robert L. Cohen, M.D.'s July 7, 2004 "First Report of the Associate Monitor Regarding Medical Care Services at the Hadix Facilities". Doc. Ent. 56 at 13-18. In his report, Cohen discusses "Nursing Services." Doc. Ent. 56 at 16-18. Cohen identifies a number of "problem areas in the nursing program[,]" among which is "[t]here is a significant problem with medication renewals." Doc. Ent. 56 at 17-18.[40]

To the extent, if at all, plaintiff's claim against Roth is based upon her April 18, 2006 review of Glasper's April 6, 2006 response to JMF-440 that "[t]he grievance medication is available. Medical needs are being met[,]" Doc. Ent. 37-7 at 15, the Sixth Circuit has stated that where defendants' "only roles . . . involve the denial of administrative grievances or the failure to act . . . they cannot be liable under § 1983." *Shehee*, 199 F.3d 295, 300 (6th Cir. 1999).

However, albeit in an unpublished case, the Sixth Circuit has also stated that "[t]he denial of the grievance is not the same as the denial of a request to receive medical care." *Martin*, 2001 WL 669983 at **2. To the extent plaintiff's claim against Roth is based an alleged interference with his oncologists' prescriptions for pain medication or failure to ensure that he has oncologist-prescribed medications (Doc. Ent. 1-3 ¶ 122), or to the extent plaintiff's claim against Roth is based

---

[40]Defendants' reply asserts that plaintiff did not respond to defendants' arguments regarding Roth. Doc. Ent. 69 at 8.

upon the fulfillment of his oncologist-prescribed chemotherapy medication (Doc. Ent. 1-3 ¶ 127) defendant Roth is not entitled to summary judgment on these issues.

**g.**     In her November 28, 2007 affidavit, Christina Perez responded to ¶ 142 of the complaint as follows: "Prisoner Davis alleges that when I work, his morphine comes up missing, and when I do not work it runs out as scheduled. Prisoner Davis's allegations against me are untrue. I have not stolen any of his medications at any time. I have no knowledge of that any of his medication has come up missing. Morphine is a controlled substance and is strictly monitored." Doc. Ent. 37-9.

If the Court agrees with my conclusion below (Section II.F.5) that Perez should be dismissed with prejudice, then it need not address plaintiff's claim(s) against Perez on the merits.

**h.**     As previously mentioned, plaintiff wrote a "Request for Compliance" to Burt on December 15, 2005 regarding the failure to follow 1993 MR 10, R 791.2205 and MDOC PD 03.03.130 ("Humane Treatment and Living Conditions for Prisoners") and in part mentioning the same-day incident with Jackson. Doc. Ent. 1-3 at 4-6. According to plaintiff, Burt did not respond. Doc. Ent. 1-3 ¶ 106. On February 24, 2006, plaintiff wrote a "Request for Compliance" to Burt regarding the failure to follow 1993 MR 10, R 791.2205 and MDOC PD 03.02.130 ("Prisoner/Parolee Grievances") and in part mentioning McMillan's February 23, 2006 rejection of what later became grievance JMF-00440. Doc. Ent. 1-3 at 17-19. Plaintiff claims that Burt "is ultimately responsible for [plaintiff's] health and well-being while incarcerated within JMF[;]" however, Burt did not respond to plaintiff's February 24, 2006 letter and did not enjoin McMillan "from interfering with [plaintiff's] ability to exhaust medically centered grievances." Doc. Ent. 1-3 ¶ 113. Plaintiff claims that "over 6 months had passed [for plaintiff to get Step II grievance appeal forms upon request] and Warden Burt failed to intervene at any time. Though I wrote her and spoke to her 3 times, she

always said she was going to look into it. . . . she certainly didn't do anything else for [him] to begin getting medical care commensurate with [his] medical condition." Doc. Ent. 1-3 ¶ 124.

Beginning on May 17, 2006 and finally on September 21, 2006, plaintiff was successful in filing grievance JMF-1849. As previously noted, it was "a grievance against JMF Warden Sherry Burt for failing to compel Grievance Coordinator Larry McMillan to cease and desist from interfering with [plaintiff's] ability to exhaust [his] administrative remedies against JMF Health Care personnel." Doc. Ent. 1-4 at 3-5.

In response to plaintiff's April and July 2007 motions for injunctive relief, Burt provided a November 20, 2007 affidavit in which she stated she "did not handle warden duties at JMF after May, 2007[;]" "did not interfere with the grievance process or rejecting of grievances pursuant to PD-03.02.130[;]" and "ha[s] no involvement in grievances that concern health care issues." Doc. Ent. 34-5 ¶¶ 1, 3, 4. She further states that "[b]ased on a review of the grievances contained in the Complaint, there are no Step II grievance responses prepared by me." Doc. Ent. 34-5 ¶ 5. Burt does not recall plaintiff's December 15, 2005 (Doc. Ent. 1-3 at 4-6) or February 24, 2006 letters (Doc. Ent. 1-3 at 17-19) and does not know whether she responded to them. She states:

> Typically, prisoner kites (letters) are responded either on the originating kite/letter, or separately, and returned to the prisoner. However, prisoner Davis should have presented the issues in these 'Request for Compliance' letters as grievances, using MDOC grievance forms. Had he done so, a record would have been maintained for three years from the creation date in accordance with MDOC's record retention schedule.

Doc. Ent. 34-5 ¶ 6.

Plaintiff has made a case that Burt may have been aware of plaintiff's alleged troubles. First, he has provided copies of the December 15, 2005 and February 24, 2006 requests for compliance

to Burt mentioned in ¶ 106 and ¶ 113 of the complaint. Second, he also claims to have spoken to Burt, who allegedly always told him she would look into it. Doc. Ent. 1-3 ¶ 124.

Third, attached to plaintiff's complaint are several communications from Penny Ryder of the American Friends Service Committee. On August 31, 2005, Penny Ryder e-mailed several people regarding the order for a single cell and prescriptions for certain medications. Doc. Ent. 1-2 at 29. On November 4, 2005, Ryder e-mailed several people regarding the recommendation of a single cell, an unfilled prescription for Vicodin[41] from the oncologist for plaintiff's leg, and the order for a bland diet. Doc. Ent. 1 at 24. Plaintiff asserts that on or about December 15, 2005, plaintiff wrote to Ryder, who allegedly electronically mailed Burt. Doc. Ent. 1-3 ¶ 105. On January 24, 2006, Ryder sent two e-mails. First, at 7:45 p.m., she e-mailed someone regarding the fact that plaintiff missed his November 22, 2005 oncology appointment due to his transfer from JCF to JMF. Doc. Ent. 1-3 at 14. Second, at 7:59 p.m., Ryder e-mailed Burt regarding the December 15, 2005 letter and the order for a single room. Doc. Ent. 1-3 at 13. It is possible that Warden Burt was a recipient of one or more of these e-mails.[42] Also, while the latter January 24, 2006 electronic mail was not forwarded by a prisoner, the copy of the second e-mail contains the handwritten note, "Nancy called yesterday. I cannot talk [with] her about your meds [and] what we are doing until you give me permission." Doc. Ent. 1-3 at 13. Such a response is consistent with Burt's representation that prisoner kites are sometimes responded to on the originating letter. More importantly, it is not clear who authorized the handwritten response.

---

[41]Vicodin are "[m]edicinal tablets used for moderate to moderately severe pain." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 5, V-84 (1995).

[42]The recipients of the e-mails have been blacked out; however, it appears that some of the recipient e-mail addresses on some of the e-mails may have had the internet service provider "@michigan.gov." Doc. Ent. 1-2 at 29; Doc. Ent. 1 at 24; Doc. Ent. 1-3 at 13, 14.

Nonetheless, as previously noted, an allegation that a supervisor was aware of an actionable wrong committed by a subordinate and failed to take corrective action "is insufficient to impose liability on supervisory personnel under § 1983." *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir. 1988). As previously noted, defendants contend that "there is no evidence indicating that . . . Burt . . . had anything to do with the transmission of those prescription orders from the oncologist to Pharmacorr." Doc. Ent. 37 at 20. Defendants also contend that plaintiff's claims against Burt "are based on [her] processing and/or responding or not responding to grievances or correspondence[,]" and that "[p]laintiff has not shown that [Burt] failed to discharge [her] supervisory duties merely because [she] did not resolve [plaintiff's] grievance to his satisfaction." Doc. Ent. 37 at 21. This is unrebutted in plaintiff's response, which with respect to JMF defendants specifically mentions only Roth and Stuparek. Doc. Ent. 56 at 10-11. With respect to Burt, defendants' reply states only that "[p]laintiff did not respond to the motion arguments of [Burt]," and that plaintiff has not refuted Burt's November 20, 2007 representation that she "had no personal involvement in the matters raised in Plaintiff's complaint." Doc. Ent. 69 at 8.

The Court should conclude that there has been no "showing that [Burt] either encouraged the specific incident of misconduct or in some other way directly participated in it. [Nor has there been a showing] that [Burt] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the [McMillan or Jackson]." *Hays v. Jefferson County, Ky.*, 668 F.2d 869, 874 (6th Cir. 1982). Therefore, to the extent plaintiff's claim against Burt is based upon her failure to respond to plaintiff's "Requests for Compliance" or Burt's failure to intervene when McMillan was allegedly interfering with plaintiff's receipt of Step II grievance appeal forms (Doc. Ent. 1 ¶¶ 106, 113, 124), the Court should dismiss these claims.

## 4.     The claims against Caruso should be dismissed.

In the conclusion to their motion brief, defendants argue that "[t]he facts alleged and the evidence on this record do not establish the requisite personal involvement of Caruso . . . necessary to establish liability under 42 USC § 1983." Doc. Ent. 37 at 23. However, defendants' third argument "concerns Defendants Burt, McMillan, Stuparek, Perez, and Roth[.]" Doc. Ent. 37 at 18. Although the third argument of the motion concerns JMF, it is not clear why the motion did not concern Caruso, on behalf of whom an appearance of counsel had been entered on October 22, 2007. Doc. Ent. 12. In any event, this report assumes that the omission of an argument on behalf of Caruso within defendants' November 29, 2007 motion is the reason why plaintiff's March 13, 2008 response does not address Caruso. Doc. Ent. 56 at 10-11.

In their *reply*, defendants argue that *Caruso and* Burt are "entitled to summary judgment because they had no personal involvement in Plaintiff's medical care or treatment." Doc. Ent. 69 at 2, 8. Relying upon the affidavits attached to defendants' November 20, 2007 response to plaintiff's motions for injunctive relief, defendants claim that Burt and Caruso "attest that they had no personal involvement in the matters raised in Plaintiff's complaint." Doc. Ent. 69 at 8.

In her November 20, 2007 affidavit, Caruso states that she has "reviewed the Plaintiff's complaint and note[s] there are no factual allegations made against [her] relative to the Plaintiff's medical treatment[;]" "had no personal involvement in or knowledge of the specific actions that form the basis for Plaintiff's complaint[;]" and "did not become aware of Plaintiff Andre Davis' allegations against [her] until [she] was served with a copy of the complaint." Doc. Ent. 34-6 ¶¶ 4, 6, 7.

Plaintiff is proceeding in forma pauperis. Doc. Ent. 5; Doc. Entries 7 and 36. 28 U.S.C. § 1915, which governs in forma pauperis proceedings, permits the Court to "dismiss the case at any time if the court determines that . . . the action or appeal . . . fails to state a claim on which relief may be granted[.]" 28 U.S.C. § 1915(e)(2)(B)(ii). "*Tingler [v. Marshall*, 716 F.2d 1109 (6th Cir. 1983)] does not prohibit a sua sponte dismissal under § 1915(e)(2) if the plaintiff is proceeding in forma pauperis." *Noble v. Sapp*, No. 98-6124, 1999 WL 1045090, *2 (6th Cir. Nov. 10, 1999); *Graham v. Mercer*, No. 98-2238, 1999 WL 1045103, *2 (6th Cir. Nov. 10, 1999).

Plaintiff's complaint identifies Caruso as the MDOC Director. Doc. Ent. 1 at 1. However, it is not clear how Caruso was personally involved in the allegations underlying plaintiff's complaint, other than in her supervisory role as the Director of the Michigan Department of Corrections. To the extent plaintiff's claim against Caruso is based upon her supervisory roll as the MDOC Director, liability in a § 1983 action cannot be based on a theory of *respondeat superior*. *See Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).

**5.      Defendant Perez should be dismissed with prejudice.**

Plaintiff's March 13, 2008 filing is in part a "[m]otion for voluntary dismissal of defendant Christina Perez[.]" Doc. Ent. 60 at 1. On March 21, 2008, defendants filed a motion for enlargement of time to file a response. Doc. Ent. 62. On March 26, 2008, I entered an order setting the response deadline for April 21, 2008. Doc. Ent. 63.

On April 22, 2008, defendants filed a response to plaintiff's motion to voluntarily dismiss defendant Perez. Doc. Ent. 70. Defendants "oppose Plaintiff's motion to voluntarily dismiss Defendant Perez, unless the dismissal is <u>with prejudice</u>[.]" Doc. Ent. 70 at 1. Alternatively,

defendants "asks that the Court resolve the issue on the merits and rule on Defendant's Motion for

Summary Judgment and Dismissal."  Doc. Ent. 70 at 6.  Specifically, defendants state:

> This litigation has consumed over seven months of time and has required both
> defendants and the court to respond to Plaintiff's two motions for injunctive relief,
> defendants' initial dispositive motion, responses to Plaintiff's motions to supplement
> and to amend, and this motion.  Defendant Perez contends that she is entitled to
> summary judgment on the merits, and Defendants submit that if Plaintiff's motion
> for voluntary dismissal is granted without prejudice it will result in successive
> litigation and further expense, to Defendant Perez's prejudice.

Doc. Ent. 70 at 7-8.

> Plaintiff's request is governed by Fed. R. Civ. P. 41(a)(2), which provides that:
> Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's
> request only by court order, on terms that the court considers proper.  If a defendant
> has pleaded a counterclaim before being served with the plaintiff's motion to
> dismiss, the action may be dismissed over the defendants' objection only if the
> counterclaim can remain pending for independent adjudication.  Unless the order
> states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a)(2).  Assuming that plaintiff's motion sought dismissal of Perez without

prejudice, "[t]hree factors are considered to determine whether a district court abused its discretion

by dismissing a complaint with prejudice when the plaintiff moved to dismiss without prejudice: (1)

whether the district court gave the plaintiff notice of its intention to dismiss with prejudice; (2)

whether the plaintiff had an opportunity to be heard in opposition to dismissal with prejudice; and

(3) whether the plaintiff was given an opportunity to withdraw the request for voluntary dismissal

and proceed with the litigation."  *Jones v. Lemke*, No. 97-2350, 1999 WL 107984, 1 (6th Cir. Feb.

9, 1999).  *See also O'Hara v. Board of Education of Brooklyn City School District*, 72 Fed. Appx.

311, **4 (6th Cir. 2003) ("By dismissing the claims with prejudice in response to plaintiff's request

for dismissal without prejudice without giving plaintiff notice of its intention to dismiss with

prejudice, an opportunity to be heard, and an opportunity to withdraw the request for voluntary

dismissal and proceed with the litigation, the court abused its discretion.") (citing *United States v. 266 Tonawanda Trail ("One Tract")*, 95 F.3d 422, 425-26 (6th Cir.1996)); *Eddins v. Summers*, No. 00-5121, 2000 WL 1478355, *1 (6th Cir. Sept. 27, 2000).

In *Jones*, the Court stated, "[a]ll three factors are met in this case. First, the magistrate judge's report clearly notified Jones that dismissal with prejudice was recommended. Second, Jones was permitted to file his objections to the magistrate judge's report out of time so that he could be heard in response to this recommendation. Third, Jones had the opportunity at that time to withdraw his motion to dismiss voluntarily." *Jones*, 1999 WL 107984 at 2. Plaintiff has not filed a reply to defendants' response to the motion for voluntary dismissal. Construing that to mean that plaintiff is not opposed to a dismissal with prejudice, the Court should dismiss defendant Perez with prejudice. Plaintiff will be permitted to file objections to this report and recommendation and, likewise, will have an opportunity to withdraw his request.

As for defendants' argument regarding the investment that has been made in this case, the Sixth Circuit discussed *Jones*'s appellate argument that "dismissal without prejudice was warranted because the defendants would not have suffered 'plain legal prejudice[.]'" *Jones*, 1999 WL 107984 at 2. "'In determining whether a defendant will suffer plain legal prejudice, a court should consider such factors as the defendant's effort and expense of preparation for trial, excessive delay and lack of diligence on the part of the plaintiff in prosecuting the action, insufficient explanation for the need to take a dismissal, and whether a motion for summary judgment has been filed by the defendant.'" *Jones*, 1999 WL 107984 at 2 (quoting *Grover by Grover v. Eli Lilly & Co.*, 33 F.3d 716, 718 (6th Cir. 1994). The Court concluded that "[t]he defendants put forth considerable effort and expense in preparing their motion for summary judgment, the plaintiff dela[y]ed his motion to dismiss until the

case was ripe for decision, and his explanation for the need to take a dismissal is clearly insufficient." *Id.* The Court need not address this argument unless plaintiff files an objection to this section of my report and recommendation.

## III. NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231, American Federation of Teachers*, AFL-CIO, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


                                        s/ PAUL J. KOMIVES
                                        PAUL J. KOMIVES
                                        UNITED STATES MAGISTRATE JUDGE
Dated: September 17, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record and Andre Davis, Reg. No. 198028, Gus Harrison Correctional Facility, 2727 E. Beecher St., Adrian, MI 49221 on September 17, 2008, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager