UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDRE DAVIS,

          Plaintiff,

                              CASE NO. 07-CV-11740-DT
                              JUDGE DENISE PAGE HOOD
                              MAGISTRATE JUDGE PAUL J. KOMIVES

  v.

PATRICIA CARUSO, et al.,

          Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
THE CMS DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS (Doc. Ent. 76)**

**I.    INTRODUCTION**

      This matter is before the Court on CMS's Defendants' Rule 12(b)(6) Motion to Dismiss

**[Docket No. 76, filed May 29, 2008]**.  This Matter is also before the Court on CMS Defendants'

Rule 41(b) Motion to Dismiss **[Docket No. 97, filed Nov. 4, 2008]**

**II.    BACKGROUND [1]**

    **A.    Underlying Facts**

      On June 29, 2004, Andre Davis underwent a "CT Chest without and with contrast

enhancement" at the Diagnostic Medical Imaging Department of the War Memorial Hospital

Radiology Department in Sault Ste. Marie, Michigan.  It was Dr. Ralph J. Duman's impression that

Davis had a "[l]arge, well defined anterior mediastinal mass with associated neck and retrocrural

---

    [1]Davis was also a party to Western District of Michigan Case Nos. 2:96-CV-00210-RHB-
TPG, *Davis v. Ulep, et al.*; 1:03-CV-00307-RJB-JGS, *Davis v. Caruso, et al.*; and 1:04-CV-00058-
WAM-ESC, *Davis v. Caruso, et al.*  He is also a party to Case No. 4:92-CV-00110-RJJ, *Hadix, et
al. v. Caruso, et al.*

lymphadenopathy." Dr. Duman stated that the "[f]indings are most likely secondary to lymphoma. Other etiologies would include thymic mass or teratoma." Furthermore, he noted a "[m]oderate size right sided pleural affusion with associated air-space disease." Doc. Ent. 1-4 at 35-36. Davis was diagnosed with "T-Cell Acute Lymphoblastic Leukemia[.]" Doc. Ent. 1 at 21 ¶ 27.

On July 8, 2004, Davis was admitted to Foote Hospital in Jackson, Michigan. On July 15, 2004, Dr. Harish Rawal performed surgery on Davis "For the placement of a CNS reservoir[.]" Doc. Ent. 1 at 21 ¶ 30; Doc. Ent. 1-4 at 38. Davis was readmitted to Foote Hospital on August 30, 2004 "due to pain and tenderness and questionable infected phlebitis of his left forearm[,]" and was discharged on September 13, 2004. He was diagnosed with phlebitis of his left arm. Doc. Ent. 1-4 at 40-41.

On November 19, 2004, Davis "began the Maintenance Course of Chemotherapy after completing both the Induction Phase and the Consolidation Phase." Doc. Ent. 1 at 25 ¶ 39. According to Davis, "[t]he Maintenance Course of Chemotherapy consists of 2 Sequences, Eleven weeks each for a period of 110 weeks[.]" Doc. Ent. 1 at 25 ¶ 40; Doc. Ent. 1-2 at 37 ¶ 93. Furthermore, he states that "[e]ach 11 Week Sequence consists of the same medications, same dosages all dependent upon [his] White-Blood Counts on any given week." Doc. Ent. 1 at 25 ¶ 41.

Davis provides what appears to be a May 5, 2005 computerized printout of his prescriptions. Doc. Ent. 1 at 42. He also provides a copy of the second sequence of his maintenance treatment. Doc. Ent. 1-4 at 44.

### B.    Complaint

On April 19, 2007, while incarcerated at Southern Michigan Correctional Facility (JMF), Plaintiff filed this 154-paragraph, verified, pro se prisoner civil rights complaint against sixteen (16)

2

defendants.  Section I of the complaint (¶¶ 1-25) concerns Chippewa Correctional Facility (URF); Section II of the complaint (¶¶ 26-101) concerns Cotton Correctional Facility (JCF); and Section III of the complaint (¶¶ 102-154) concerns Southern Michigan Correctional Facility (JMF). Plaintiff's complaint is based upon the Eighth Amendment deliberate indifference to a serious medical need and First Amendment access to courts and retaliation.  He seeks compensatory damages, punitive damages and injunctive relief.  Doc. Ent. 1 at 5.

Plaintiff is currently incarcerated at Muskegon Correctional Facility (MCF).[2] The matter was referred to a Magistrate Judge to conduct pretrial matters, but the reference was withdrawn on March 30, 2009.  The Attorney General has filed an appearance on behalf of twelve (12) defendants: Caruso, Covert, Merling, Gardon, Ives, Lee, Burt, McMillan, Roth, Perez, Stuparek and Glasper. Doc. Entries 12, 32, 50.  Appearances have also been filed on behalf of Westover, Antonini and CMS ("the CMS defendants"). Doc. Entries 74 and 75.  It appears that David Komjathy has not been served with this lawsuit.  Doc. Entries 21, 33.[3]

C.    **Dispositive Motions Concerning the CMS Defendants**

On November 29, 2007, eleven (11) MDOC defendants filed a motion for dismissal and/or summary judgment.  Doc. Ent. 37.  On March 13, 2008, Plaintiff filed what was in part a motion for voluntary dismissal of Defendant Perez.  Doc. Ent. 60.  Magistrate Judge Komives has entered a report and recommendation with respect to these motions.  Doc. Ent. 89.

---

[2]*See* www.michigan.gov/corrections, "Offender Search."

[3]According to Plaintiff's complaint, Komjathy is contracted by CMS.  Doc. Ent. 1 at 2. On January 9, 2008, Magistrate Judge Komives entered an order requiring Plaintiff to provide current addresses for Westover, Komjathy and Antonini.  Doc. Ent. 46.  On March 31, 2008, Plaintiff provided the Court with an address for CMS, Antonini, Komjathy and Westover.  Doc. Ent. 66.

Furthermore, on May 7, 2008,  MDOC Defendant Glapser filed a motion for summary judgment.  Doc. Ent. 72.

###    D.    The Instant Motion

On May 29, 2008, the CMS defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  They argue that (A) "defendants are entitled to dismissal under 42 U.S.C. § 1997e(a) based on Plaintiff's failure to properly exhaust administrative remedies[;]" (B) "defendants are entitled to dismissal due to Plaintiff's failure to state a claim of deliberate indifference under 42 U.S.C. § 1983[;]" and (C) "defendant [CMS] is entitled to dismissal or summary judgment due to Plaintiff's failure to state [a claim] against defendant [CMS][.]" Doc. Ent. 76 at 5.[4]

On June 3, 2008, Magistrate Judge Komives entered a scheduling order setting the response deadline for July 16, 2008.  Doc. Ent. 77.  Plaintiff did not file a timely response.  However, on December 5, 2008, Plaintiff filed  a response to the CMS defendants' motion to dismiss.  Doc. Ent. 101.  Therein, he asserts that the CMS defendants' motion "should be denied as frivolous."  Doc. Ent. 101 at 1.

## IIII    STANDARD OF REVIEW

Federal Rule of Civil Procedure 12 sets forth rules regarding defenses and objections.  As to how defenses should be presented, the rule states in pertinent part:

> Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required.  But a party may assert the following defenses by motion:
> . . . (6) failure to state a claim upon which relief can be granted[.]

---

[4]Attached to the CMS defendants' motion are (A) a copy of the MDOC PD 03.02.130, effective December 19, 2003 (Doc. Ent. 76-3); (B) copies of MDOC grievances that Plaintiff appealed to Step III (Doc. Ent. 76-4); and (C)-(E) copies of unpublished cases (Doc. Entries 76-5, 76-6, 76-7).

Federal Rules of Civil Procedure 12(b)(6). "If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1964-1965 (2007) (citations and quotations omitted). "Factual allegations must be enough to raise a right to relief above the speculative level, . . . on the assumption that all the allegations in the complaint are true[.]" *Bell Atlantic Corp.*, 127 S. Ct. at 1965 (citations and quotations omitted). It is not enough that "the pleadings [leave] open the possibility that a plaintiff might later establish some 'set of [undisclosed] facts' to support recovery." *Id*. at 1968. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Id*. at 1970. "[W]e do not require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974. Claims should be "nudged . . . across the line from conceivable to plausible" to avoid dismissal. *Id.*

The reviewing court must construe the complaint in the light most favorable to plaintiff and must presume all factual allegations in the complaint as true. *See Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). The purpose of Rule 12(b)(6) is to give defendant the opportunity to test whether plaintiff is entitled to legal relief as a matter of law even if everything alleged in the complaint is true. *See Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993). "The

Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." *Conley v. Gibson*, 355 U.S. 41, 48 (1957).  A dismissal under Rule 12(b)(6) is generally disfavored by courts, as it is a dismissal on the merits. 2A JAMES W. MOORE, MOORE'S FEDERAL PRACTICE ¶ 12.07 (2d ed. 1995).

## IV.    LAW & ANALYSIS

### A.    The CMS defendants are not entitled to dismissal under 42 U.S.C. § 1997e(a) based on Plaintiff's failure to properly exhaust administrative remedies.

42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Under the Michigan Department of Corrections Policy Directive 03.02.130, prisoners and parolees may seek "redress for alleged violations of policy and procedure or unsatisfactory conditions of confinement."   MDOC PD 03.02.130 ("Prisoner/Parolee Grievances"), effective 03.02.130.

Attached to the CMS defendants' motion are copies of fifteen (15) grievances:  URF-04-05-911 (Doc. Ent. 76-4 at 4-8); JCF-04-10-2529 (Doc. Ent. 76-4 at 9-13); JCF-04-10-2553 (Doc. Ent. 76-4 at 14-18); JCF-04-11-28920 (Doc. Ent. 76-4 at 19-23); JCF-04-11-2891 (Doc. Ent. 76-4 at 24-28); JCF-05-02-00419 (Doc. Ent. 76-4 at 29-33); JCF-05-05-1133 (Doc. Ent. 76-4 at 34-38); JCF-05-07-01639 (Doc. Ent. 76-4 at 39-43); JCF-05-08-01794 (Doc. Ent. 76-4 at 44-48); JCF-05-06-01428 (Doc. Ent. 76-4 at 49-52); JCF-05-07-01578 (Doc. Ent. 76-4 at 53-57); JCF-05-07-01579 (Doc. Ent. 76-4 at 58-62); JMF-06-10-01932 (Doc. Ent. 76-4 at 63-69); JMF-06-09-1849 (Doc. Ent. 76-4 at 70-77); and JMF-06-10-01933 (Doc. Ent. 76-4 at 78-83).

The CMS defendants argue that "[b]ecause Plaintiff did not properly pursue any relevant grievance through the entire grievance procedure in compliance with the grievance procedure rules against Defendants, he did not properly exhaust his administrative remedies as to those Defendants." Doc. Ent. 76 at 3 ¶ 14.  They further argue that "[a]bsent documentation or some showing of the exhaustion of the administrative remedies as to the Defendants, Plaintiff cannot bring this suit against those Defendants, as it is barred by 42 U.S.C. § 1997e."  Doc. Ent. 76 at 3 ¶ 15.

In their brief, the CMS defendants argue that "Plaintiff has failed to properly exhaust all administrative remedies available to him with respect to Defendants Dr. Westover, and Dr. Antonini, and for this reason, those Defendants are entitled to dismissal."  Doc. Ent. 76 at 15.  According to the CMS defendants, their counsel "requested copies of Plaintiff's MDOC grievance records pertaining to health care from the MDOC Co-Defendants' counsel, and they provided Defendants' counsel with copies of all the health care grievances from 2004 through the present which Plaintiff pursued through Step III."  Doc. Ent. 76 at 15-16.  After describing each of the fifteen (15) grievances attached to their motion, the CMS defendants assert that "Plaintiff did not exhaust his administrative remedies as to CMS, Dr. Antonini, or Dr. Westover."  Doc. Ent. 76 at 16-20, 20. They argue that "[t]he proffered grievances are insufficient to demonstrate exhaustion as to any of those Defendants."  Doc. Ent. 76 at 23.

Plaintiff claims that sixty (60) of the seventy-nine (79) pages of grievances attached to the CMS defendants' motion "have <u>nothing</u> to do with their defense."  Plaintiff claims that only four (4) of the fifteen (15) aforementioned grievances "are relevant to these defendants[,]" and eleven (11) are irrelevant.  Doc. Ent. 101 at 2.  Based upon the CMS defendants' descriptions of the fifteen (15) grievances, it appears that Plaintiff is referring to grievances URF-04-05-911-12d2; JCF-04-10-

7

2553-12f; JCF-05-05-1133-12f; and JCF-05-07-1639.  Doc. Ent. 76 at 16-20.  Citing § Y of MDOC PD 03.02.130, which describes the Grievance Coordinator's responsibilities once he/she receives a Step I grievance, Plaintiff claims the MDOC defendants "are in no position to question the findings of the Grievance Coordinator, who processed every single one of the grievances attached to their Motion."  Based upon Exhibit B to the CMS defendants' Rule 12(b)(6) motion (Doc. Ent. 76-4), Plaintiff claims he followed the procedural requirements.  Plaintiff claims they should rely only on the procedural requirements, which "are satisfied by the acceptance or rejection of a grievance by a person whose duty it is to make that determination."  Doc. Ent. 101 at 4.

Section § 1997e(a)'s "exhaustion requirement applies to all prisoners seeking redress for prison circumstances or occurrences."  *Porter v. Nussle*, 534 U.S. 516, 520 (2002).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter*, 534 U.S. at 532.  In *Jones v. Bock*, 549 U.S. 199 (2007), the Supreme Court held that "failure to exhaust is an affirmative defense under the PLRA," and "inmates are not required to specially plead or demonstrate exhaustion in their complaints."  *Jones*, 549 U.S. at 216.  "Compliance with prison grievance procedures . . . is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218.  "Congress has provided in § 1997e(a) that an inmate must exhaust irrespective of the forms of relief sought and offered through administrative avenues."  *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001).  "[P]roper exhaustion of administrative remedies is necessary."  *Woodford v. Ngo*, 548 U.S. 81, 84 (2006).

Under *Jones*, in the general run of cases a Rule 12(b)(6) motion to dismiss based on the plaintiff's failure to demonstrate exhaustion in the complaint is no longer appropriate.  Because lack

of exhaustion is an affirmative defense, it falls to the defendants to demonstrate that the claims have

not been exhausted.  This generally will not be determinable based on the face of the complaint, and

it is only the complaint that may be considered in deciding a Rule 12(b)(6) motion.  Rather,

dismissal on exhaustion grounds will generally have to be accomplished, if at all, through a properly

supported motion for summary judgment including some evidence (such as the affidavit of a record

keeper describing all grievances filed by the Plaintiff) showing that the claims have not been

exhausted.  It is true that, in some cases, the face of the complaint itself may establish a lack of

exhaustion, such as where the plaintiff admits in the complaint that she has not exhausted.  *See id.*

at 215 (noting that dismissal under Rule 12(b)(6) on the basis of an affirmative defense, such as a

statute of limitations, may be had where "the allegations in the complaint suffice to establish that

ground.").  However, because Rule 12(b)(6) tests the sufficiency of the complaint, "[a]n affirmative

defense may only be considered on a motion to dismiss if it clearly appears on the face of the

complaint."  *Beuster v. Equifax Information Servs.*, 435 F. Supp. 2d 471, 480 (D. Md. 2006)

(internal quotation omitted); *see also*, *Official Committee of Unsecured Creditors of Color Tile, Inc.*

*v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003) (internal quotation omitted)

(dismissal for failure to state a claim based on affirmative defense appropriate only "if the defense

appears on the fact of the complaint.").          Because lack of exhaustion is an affirmative defense,

dismissal under Rule 12(b)(6) is appropriate only if it appears from the face of the complaint that

plaintiff has not, in fact, exhausted.  It is not enough that plaintiff fails to allege that she has

exhausted; nor is it sufficient that the grievances plaintiff has attached fail to show exhaustion.

Rather, the complaint affirmatively must show that plaintiff has not exhausted.  In fact, in the

"administrative remedies" portion of his complaint, Plaintiff explains that "[f]or some of my

grievances I have included kites to the Grievance Coordinator requesting Second Step Appeal forms. I've included copies of 3rd Step Grievances I've filed asking someone to [compel] the grievance coordinator to send me 2nd Step Appeal forms, including kiting the Warden. The majority of my grievances were exhausted to the 3rd Step." Doc. Ent. 1 at 4. However, even though Plaintiff claims in his December 5, 2008 response that only four (4) of the fifteen (15) grievances attached to the instant motion are relevant to the CMS defendants (Doc. Ent. 101 at 2), Plaintiff's complaint does not admit a failure to exhaust, nor provide any other basis on its face to conclude from the allegations that Plaintiff has not exhausted her claims as a matter of law.[5]

Accordingly, under *Jones* and the ordinary standards governing Rule 12(b)(6) motions, the CMS defendants' motion is denied to the extent it argues that Plaintiff has failed to exhaust his administrative remedies against the CMS defendants. This conclusion satisfies the CMS Defendants' concern that "[i]n the event that this Court believes that the Rule 56 standard applies, Defendants request the opportunity to present all material made pertinent to such a motion, per Fed. R. Civ. P. 12(b)[,]" as well as their reservation of "the right to bring a subsequent Motion for Summary Judgment after conducting discovery." Doc. Ent. 76 at 13.[6]

---

[5]Furthermore, it is worth noting that the fifteen (15) grievances attached to the CMS defendants' Rule 12(b)(6) motion appear on a grievance inquiry which appears to list only grievances that have been appealed to Step III. Doc. Ent. 76-4 at 2-3. Based upon an attachment to the MDOC defendants' motion to dismiss, it is seems that Plaintiff filed forty-two grievances at JMF alone. Doc. Ent. 37-7. Therefore, the possibilities exist that (1) a grievance which was not appealed to Step III is arguably exhausted (*i.e.*, was resolved at an earlier stage, presents a non-grievable issue, etc.) or (2) Plaintiff, as suggested by his complaint, was stunted in his ability to appeal his grievance.

[6]With respect to the effect of their attachments to their Rule 12(b)(6) motion upon the standard under which it is analyzed, the CMS defendants cite *Passa v. City of Columbus*, 123 Fed.Appx. 694 (6th Cir. 2005), wherein the Court stated, "[a]ll circuits to consider the issue have noted that a court may take judicial notice of at least some documents of public record when ruling on a Rule 12(b)(6) motion." *Passa*, 123 Fed.Appx. at 697. The Court explained that:

**B.     Defendant Westover is entitled to dismissal on the basis of Plaintiff's failure to state a claim of deliberate indifference under 42 U.S.C. § 1983; however, Defendant Antonini is not entitled to dismissal on that basis.**

Plaintiff's complaint makes many specific references to individual CMS Defendants Westover and Antonini.  According to the complaint, Defendant Westover was assigned to URF.  Doc. Ent. 1 at 2.  Within the URF portion of Plaintiff's complaint (¶¶ 1-25), Plaintiff claims that, on April 21, 2004, he "was scheduled to see Dr. Robert M. Westover about a protruding growth on [his] lower left neck approx. an inch above the collar-bone."  Doc. Ent. 1 at 6 ¶ 2.  Plaintiff alleges

---

The majority of these courts, however, have held that the use of such documents is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein.  Further, in general a court may only take judicial notice of a public record whose existence or contents prove facts whose accuracy cannot reasonably be questioned.  Despite the fact that the majority of such cases dealt with the public filings of private corporations or of judicial proceedings, at least one court has noted that even a judicial opinion may not be relied upon, in a motion to dismiss, for the truth of the facts within.  In general, the majority of the cases which do not allow a court to take judicial notice of the contents of a public record do so because there is no way for an opposing party, prior to the issuance of the court's decision, to register his or her disagreement with the facts in the document of which the court was taking notice.  Thus, in order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute.

*Passa*, 123 Fed.Appx. at 697 (internal citations omitted).  *See also Hayes v. Mid-Ohio Securities, Corp.*, No. 1:05-cv-1800, 2006 WL 2233234, 2 (N.D. Ohio Aug. 3, 2006) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint, even if not attached, if such materials are public records or are otherwise materials appropriate for the taking of judicial notice.").

Citing *Passa* and *Hayes*, the CMS defendants state that "matters of the public record are appropriate for judicial notice, as neither the existence of these documents nor their contents can reasonably be disputed.  Therefore, such documents do not alter the Motion's 12(b)(6) basis."  According to the CMS defendants, the administrative grievance records attached to their motion (Doc. Ent. 76-4) can be obtained via a FOIA request, and MDOC PD 03.02.130 (Doc. Ent. 76-3) can be obtained on www.michigan.gov/corrections.  Doc.  Doc. Ent. 76 at 13.

However, even if MDOC PD 03.02.130 and the grievances are matters of public record, this Court's conclusion is unchanged.  This is so, because it is clear that grievances exist other than the ones attached to the CMS defendants' motion.

11

2:07-cv-11740-DPH-PJK   Doc # 107   Filed 03/30/09   Pg 12 of 30   Pg ID 1157

that "[o]n May 5, 2004[,] Dr. Robert M. Westover, said the lump was probably a swollen lymph node of unknown etiology, and scheduled an x-ray and blood test for May 10, 2004." Doc. Ent. 1 at 6 ¶ 3. Plaintiff claims that "[o]n May 11, 2004, [he] wrote a grievance [URF-00911] as the lump was becoming increasingly tender and larger in size and [he] was not seen nor received any diagnostic testing as told would occur on May 10, 2004 by Dr. Westover." Doc. Ent. 1 at 6 ¶ 4. In order to resolve the grievance, Plaintiff claims, he "was given the testing ordered on May 5, 2004; with an appointment scheduled for June 17, 2004 to consult with Dr. Westover about the results of those tests[.]" Doc. Ent. 1 at 6 ¶ 5.

On June 17, 2004, in connection with URF-04-05-0911-12z, Plaintiff met "with Dr. Westover, to discuss the findings of the X-Ray and blood test[.]" Doc. Ent. 1 at 13 ¶ 16. According to Plaintiff, "Dr. Westover told me that there was an [alleged] clerical error with the blood test, and that the X-Ray was taken from an 'atypical view' that did not show the area of the lump. He then stated he would put it in, but did not believe CMS would approve any further testing. The initial testing failed for reasons having nothing to do with me, or my medical problems." Doc. Ent. 1 at 13 ¶ 17. Plaintiff states that "[b]y appearances, Dr. Westover may have intentionally ordered the X-Ray taken from the wrong view." Doc. Ent. 1 at 20 ¶ 24.[7]

Defendant Antonini was assigned to JCF but is now assigned to JMF. Doc. Ent. 1 at 2. Within the JCF portion of the complaint (¶¶ 26-101), Plaintiff describes a November 18, 2004 incident. Plaintiff alleges that Ives told him the doctor needed to see Plaintiff's foot, took Plaintiff

---

[7]On June 29, 2004, Plaintiff was examined at the War Memorial Hospital Radiology Department for a superclavical mass. Doc. Ent. 1-4 at 35-36. Plaintiff underwent surgery at Foote Hospital on July 15, 2004 for a right frontal bur hold with insertion of CNS reservoir. Doc. Ent. 1-4 at 38. He was admitted to Foote Hospital on August 30, 2004, and was discharged on September 13, 2004 with a diagnosis of "[a]cute lymphoblastic leukemia." Doc. Ent. 1-4 at 41.

to an examination room and asked Antonini to look at Plaintiff's foot.  However, Antonini would

not see Plaintiff.  Ives returned five minutes later and informed Plaintiff that Antonini had written

a prescription for Tegretol (Carbamazepine).[8]  Doc. Ent. 1 ¶ 35; Doc. Ent. 1 at 42.  Plaintiff alleges

that "Antonini never once came and looked at [Plaintiff's] foot, never talked to [Plaintiff], never had

any contact with [him] whatsoever at any time during the month of November.  Not even after

prescribing Tegretol."  Doc. Ent. 1 at 22 ¶ 36.  On November 24, 2004, Plaintiff "had not yet

received the medication prescribed by Dr. Antonini for [Plaintiff's] foot[.]" Doc. Ent. 1 at 25, 31 ¶

46.

During a May 5, 2005 appointment with Dr. Boxer, one of Plaintiff's oncologists, Plaintiff

explained that Antonini had prescribed the Tegretol.  Doc. Ent. 1 at 21 ¶ 26; Doc. Ent. 1 at 41 ¶ 59.

Plaintiff describes Boxer's reaction, which allegedly included her statement, "he could've killed

you."  Doc. Ent. 1 at 43 ¶¶ 61, 62.  Thereafter, Plaintiff alleges, Antonini "took a complete 'hands-

off' approach to [Plaintiff].  Even more[]so than before, by continuously not filing prescriptions

written by [Plaintiff's] Oncologist[s], from pain medication, all the way up to chemo-drugs in

accordance with the Maintenance Schedule."  Doc. Ent. 1 at 43 ¶ 63.[9]

Plaintiff claims that it did seem strange that Antonini refused to see Plaintiff; however,

Plaintiff suspects Antonini has animosity toward Plaintiff based upon an August 2004 incident.

Doc. Ent. 1 at 48 ¶¶ 67-71.  In fact, Plaintiff contends that Antonini "took the opportunity provided

[8]Carbamazepine is "[a] medicinal substance used to prevent or relieve convulsions."
SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 1, C-45 (1995).  Tegretol is "[a]
medicine used in the treatment of epileptic seizures and trigeminal neuralgia[.]"  SCHMIDT'S
ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 4, T-24 (1995).

[9]Within his complaint, Plaintiff alleges that the State of Oklahoma revoked Antonini's
medical license in 1994, and Antonini was disciplined in Michigan during 1997 . Doc. Ent. 1 at 48
¶ 66.

by the ailment of [Plaintiff's] right foot . . . to inflict that retribution." Doc. Ent. 1-2 at 2 ¶ 71. In Plaintiff's opinion, "[c]onsidering how hard [his oncologists] fought, to preserve [his] life, it is beyond comprehension how [Antonini] could – and for that matter – would take actions not only contrary to the treatment plan prescribed by [his] Oncologists, but also inimical to [his] health and overall well-being." Doc. Ent. 1-2 at 3 ¶ 74. Citing JCF-00419, Plaintiff claims "there is no incentive for [Antonini, Gardon and/or Ives] to cease and desist interfering with the Prescribed Treatment Plan[.]" Doc. Ent. 1-2 at 4, 11 ¶ 78. The complaint also mentions Antonini's alleged failure to accommodate a single room. Doc. Ent. 1-2 at 21, 26 (¶¶ 87-88); Doc. Ent. 1-2 at 44, 46 (¶ 99).[10]

Within the JMF portion of the complaint (¶¶ 102-154), Plaintiff claims that "while at JCF, [he] never ran out of pain medication once Dr. Antonini prescribed it. It just took [Plaintiff] almost dying from the 'Tegretol Incident' and numerous calls from [his] family, from [his] Oncologist[s], Penny Ryder and PLSM to get [Antonini] to act like [Plaintiff's] MSP; he was unwilling to do it of his own volition. Even then, he never saw me, the nurse would just take my file to him and he'd write the prescription sight unseen. Worked better than the program [at JMF], where Dr. Komjathy was not writing prescriptions for pain medication until grievances and calls were made." Doc. Ent. 1-3 at 36 ¶ 120. Plaintiff also claims that "under the tutelage of 'newly appoint[ed]–JMF Head of Medicine–Dr. Audberto Antonini[,][' ] Dr. Komjathy has picked up where Dr. Antonini left off; as if Dr. Komjathy was not doing enough harm on his own, he now has a 'rap-partner' in providing sub-standard medical care amounting to the equivalent of no medical care at all." Doc. Ent. 1-4 at

---

[10]In a "CMS Specialty Consult Report" dated June 7, 2005, Dr. Axelson recommended a single room. Doc. Ent. 1-2 at 27.

27 ¶ 145.  Plaintiff asserts that "a year after [Antonini] almost kills [Plaintiff], [Antonini is] transferred to another prison and given a promotion.  He's been sent here [JMF] to show these doctors how to save money by discarding prisoner medical concerns and they are acting in accord.  Dr. Komjathy in particular.  Since the arrival of Dr. Antonini, [Plaintiff has] yet to receive [his] chemotherapy medications as ordered by [his] Oncologist[s], even though Dr. Komjathy is [Plaintiff's] assigned MSP."  Doc. Ent. 1-4 at 30 ¶ 154.

The CMS Defendants characterize Plaintiff's claims against Westover as alleging that "Dr. Westover ordered a chest x-ray and blood work after Plaintiff reported having a lump in his chest in May 2004 and that the x-ray was taken from the wrong view, resulting in an x-ray which did not show the lump."  Doc. Ent. 76 at 2 ¶ 4.  They characterize Plaintiff's claims against Antonini as alleging that "Dr. Antonini planned to prescribe antibiotics to Plaintiff in August 2004 but a nurse practitioner checked with Plaintiff's oncologist, who did not want Plaintiff to take the antibiotics; therefore, Plaintiff was not prescribed the antibiotics."  Doc. Ent. 76 at 2 ¶ 5.  Furthermore, they claim that Plaintiff alleges "Dr. Antonini refused to see him for his swollen foot or neuropathy in his foot in November 2004 and instead prescribed Tegretol to him and that in May 2005, his oncologist discontinued the Tegretol, stating that it could have killed Plaintiff."  Doc. Ent. 76 at 2 ¶ 6.  According to the CMS Defendants, the complaint "generally fails to state a claim of deliberate indifference under 42 U.S.C. § 1983 in that Plaintiff fails to establish that the Defendants wantonly inflicted pain upon him."  Doc. Ent. 76 at 3 ¶ 16.

With respect to the aforementioned claims against Westover, the CMS Defendants assert that Plaintiff's complaint "does not specifically assert the manner in which he believes Defendants violated his civil rights[,]" and "he has failed to state a claim against Dr. Westover."  With respect

15

to the aforementioned claims against Antonini, the CMS Defendants assert that "taken in a light most favorable to the Plaintiff, establishes only that Plaintiff's oncologist had a different opinion about whether Plaintiff should take certain medications than Dr. Antonini did." Doc. Ent. 76 at 21. They explain that "one would expect that an oncologist would have more specialized knowledge about medications appropriate for a cancer patient than a non-oncologist." Doc. Ent. 76 at 21-22. Citing *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998) ("the Court need not accept as true legal conclusions or unwarranted factual inferences.") (citing cases), the CMS Defendants state, "Plaintiff makes the bald assertion that Dr. Antonini intentionally prescribed medication that he knew would harm Plaintiff; however, Plaintiff has no factual allegations whatsoever which support this serious allegation." According to the CMS Defendants, "Plaintiff's assertion that Dr. Antonini intentionally tried to harm him is unsupported by any reasonable factual basis; and therefore, is insufficient to state a claim of deliberate indifference against Dr. Antonini." Doc. Ent. 76 at 22.

As an initial matter, Plaintiff's response states that in Paragraph 5 of their motion, the CMS Defendants have mischaracterized the allegations against Antonini for an August 2004 incident described in Paragraphs 37 and 68 of his complaint. Plaintiff states that the incident described in Paragraphs 37 and 68 of his complaint was not an allegation. Plaintiff observes that he did not file a grievance about the incident described in these paragraphs of his complaint, as compared with the grievances filed regarding his other constitutional allegations. Doc. Ent. 101 at 2.

Plaintiff asserts that his claims against Westover and Antonini "are part of the greater whole of [his] complaint[.]" Citing the September 17, 2008 Report and Recommendation (Doc. Ent. 89), Plaintiff claims that his complaint "has already been determined to state a claim." Doc. Ent. 101 at

16

3.  Specifically, he notes the recommendation regarding MDOC Defendant Ives' part in the November 18, 2004 incident.  Doc. Ent. 101 at 3-4.

Based upon his citations to *Boretti v. Wiscomb*, 930 F.2d 1150, 1155 (6th Cir. 1991) ("plaintiff alleges that he suffered pain and mental anguish from the delay in care.  For these reasons, we believe plaintiff has adequately stated a claim of a violation of the Eighth Amendment for which he could recover damages.") and *Comstock v. McCrary*, 273 F.3d 693, 708 n.5 (6th Cir. 2001) (citing *Estelle v. Gamble*, 429 U.S. 97, 104-05 & n. 10 (1976)) ("a prison doctor's medical response to an inmate's serious need may constitute deliberate indifference just as readily as the intentional denial or delay of treatment."), Plaintiff's claim against Westover appears to be based upon an alleged denial of or delay in treatment.  Doc. Ent. 101 at 6.

With respect to the CMS Defendants' defense of Antonini, Plaintiff claims that "the Defendants' [have] acknowledg[ed] . . . the specialized needs of Plaintiff's medical condition[,]" and "[t]his is important, because it supports their knowledge of what Plaintiff was dealing with[,]" and "[i]t supports the fact that Dr. Antonini did violate the constitution when he failed to **examine Plaintiff** prior to prescribing Tegretol."  Doc. Ent. 101 at 6-7 (emphasis in original).  Plaintiff states that he "was a cancer patient at the time[,]" and "[t]he very nature of [his] underlying medical condition precluded any possibility that prescribing any medication, [nonetheless] a controlled, anti-seizure medication would be within the bounds [of] proper medical treatment."  Doc. Ent. 101 at 7.

Plaintiff specifically states that "[t]his claim is not about a 'difference' of opinion.  This claim is about Defendant Antonini's failure to examine prior to prescribing a medication that almost killed Plaintiff.  That action is bad for any patient, but it is doubly egregious for a patient with a medical ailment requiring 'specialized knowledge'."  Again relying upon *Comstock*, 273 F.3d at

17

706,[11] Plaintiff claims that Antonini "in prescribing Tegretol without first examining Plaintiff was 'doing less than [his] training indicated was necessary.'"  Plaintiff also relies upon *Rosen v. Chang*, 811 F.Supp. 754 (D.R.I. 1993), wherein the Court stated, "[g]rossly incompetent and recklessly inadequate examination by a licensed physician is a deliberately indifferent examination. This is ineluctably so when the manifested symptoms scream of a diagnosis that virtually lies within the knowledge of a lay person.  It can hardly be gainsaid that any doctor would know or should have known his conduct was 'beyond the pale.'  To attempt to argue that such opprobrious behavior falls within the bounds of constitutionally acceptable conduct is like insisting the fabled unicorn and martians actually exist." *Rosen*, 811 F.Supp. at 760.  Plaintiff claims that his complaint does not allege that his oncologists recommended a different medication and insists "[t]his allegation has always been about Defendant Antonini's failure to examine Plaintiff prior to prescribing the contra-indicated Tegretol."  Doc. Ent. 101 at 7.

The CMS Defendants contend that "[w]hile Plaintiff may not be happy with the treatment provided, such dissatisfaction does not give rise to a cause of action for deliberate indifference." Doc. Ent. 76 at 22.  "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment."  *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (internal quotations and citations omitted).  "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison

---

[11]"[I]f McCrary was not 'failing to treat' Montgomery, or 'doing less than [his] training indicated was necessary,' *Williams[v. Mehra*, 186 F.3d 685, 692 (6th Cir. 1999)], when he reevaluated Montgomery on March 3, 1995, then he cannot be said to have consciously disregarded the risk of serious harm." *Comstock*, 273 F.3d at 706.

guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-105 (footnotes omitted).

"[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Estelle*, 429 U.S. at 106.  As the Sixth Circuit has noted, "[d]eliberate indifference, however, does not include negligence in diagnosing a medical condition." *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (citing *Estelle*, 429 U.S. at 106).  "A medical decision not to order an X-ray, or like measures, does not represent cruel and unusual punishment. At most it is medical malpractice, and as such the proper forum is the state court[.]" *Estelle*, 429 U.S. at 107.

In *Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976), the Court stated: "We distinguish between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment.  Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law.  Of course, in some cases the medical attention rendered may be so woefully inadequate as to amount to no treatment at all." *Westlake*, 537 F.2d at 860 n.5 (6th Cir. 1976) (citations omitted).

The CMS Defendants are correct to acknowledge that "decisions made by the appropriate professional are entitled to a presumption of correctness.  Such a presumption is necessary to enable institutions of this type-often, unfortunately, overcrowded and understaffed-to continue to function.  A single professional may have to make decisions with respect to a number of residents with widely

19

varying needs and problems in the course of a normal day.  The administrators, and particularly professional personnel, should not be required to make each decision in the shadow of an action for damages." *Youngberg v. Romeo*, 457 U.S. 307, 324-325 (1982) (regarding a state institution for the mentally retarded).

Plaintiff's claims with respect to Westover do not state a claim of deliberate indifference to Plaintiff's serious medical need.  First, Plaintiff's complaint does not attribute the delay in performing an X-ray and blood test from May 10, 2004 (scheduled by Westover on either May 5 or 7, 2004) to the date of May 13, 2004 to Westover.  Doc. Ent. 1 at 6 ¶¶ 2-5; Doc. Ent. 1 at 7-8 (URF-00911).[12]  Second, Plaintiff alleges that on June 17, 2004, "Westover told [Plaintiff] that there was an [alleged] clerical error with the blood test, and that the X-Ray was taken from an 'atypical view' that did not show the area of the lump.  He then stated he would put it in, but did not believe CMS would approve any further testing.  The in[i]tial testing failed for reasons having nothing to do with me, or my medical problems."  Doc. Ent. 1 at 13 ¶ 17.  This does not allege deliberate indifference.  In fact, Westover's alleged willingness to request further testing suggests the opposite.[13]  Third, Plaintiff's claim that "Westover may have intentionally ordered the X-Ray taken from the wrong view[,]" Doc. Ent. 1 at 20 ¶ 24, is an unwarranted factual inference.  *See Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998) (on appeal from district court's dismissal of ERISA claims on Rules 12(b) and 12(c) motions, "the Court need not accept as true legal conclusions or unwarranted factual inferences.") (citing cases).

_____

[12]In fact, the May 13, 2004 Step I grievance response states that "[l]ab and x-rays were prescribed.  A clerical error occurred and the lab was not scheduled."  Doc. Ent. 1 at 8 (URF-00911).

[13]According to Plaintiff, the June 29, 2004 CT Scan of his neck and chest followed his letter to U.S. Representative John Conyers, whose office "pressured CMS approval for a CT Scan of [Plaintiff's] neck and chest[.]"  Doc. Ent. 1 at 13, 19 ¶ 18; Doc. Ent. 1 at 20 ¶ 23.

However, Plaintiff's claims against Antonini do state a claim of deliberate indifference to Plaintiff's serious medical need.  There are several places in Plaintiff's complaint where he states his claims are not about a difference of opinion.  For example, Plaintiff states that Antonini "wrote a prescription for an anti-seizure medication without diagnosing a problem to justify administering the medication.  He had an opportunity to diagnose a problem; rather, chose to punish me, as his past history indicates.  Then – failed to make any entry in my medical file, other than 'The Prescription Order' itself, preventing any type of follow-up care.  No one would be able to go behind him and question his authority[.]"  Doc. Ent. 1-2 at 17 ¶ 81.  Plaintiff claims that the severe consequence of administering Tegretol to Plaintiff and Antonini's failure to note why he prescribed Tegretol "infers that Dr. Antonini did not expect [Plaintiff] to live long enough to hold him accountable."  Doc. Ent. 1-2 at 17 ¶ 82.  Plaintiff also claims that Ives, Gardon and Antonini's actions with regard to the Tegretol resulted "in an invasive, painful, and unnecessary surgical procedure–Bone Marrow Biopsy [on April 28, 2005][.]"  Doc. Ent. 1-2 at 20-21 ¶ 85; Doc. Ent. 1 at 37 ¶ 53.

Furthermore, in the JCF portion of his complaint with respect to the order for a single cell, Plaintiff states, "[i]t is not about me disagreeing.  I would never have even mentioned a single cell, had my oncologist[s] not recommended it first.  That's the bottom line.  I am not the 'originator of the request'."  Doc. Ent. 1-2 at 46 ¶ 99.  In light of the foregoing analysis, this Court is persuaded that Defendant Antonini is not entitled to summary judgment.

### C.    Defendant CMS is not entitled to dismissal or summary judgment due to Plaintiff's failure to state a claim against Defendant CMS.

The caption of Plaintiff's complaint lists CMS as a defendant.  Doc. Ent. 1 at 1.  Although the list of "additional parties" does not enumerate CMS as a defendant, the list does state that several individual defendants are "[c]ontracted by CMS[.]"  Doc. Ent. 1 at 2.  In the "Statement of Facts,"

21

Plaintiff alleges interference "by the prison medical personnel all working as contracted employees of CMS." Plaintiff also alleges retaliation by "CMS Contracted Doctor David Komjathy[.]" Doc. Ent. 1 at 5.

However, there are several places within Plaintiff's complaint that make it clear he intended CMS to be a defendant. For example, in the URF portion of Plaintiff's complaint (¶¶ 1-25), Plaintiff claims that Westover stated, he "did not believe CMS would approve any further testing." Doc. Ent. 1 at 13 ¶ 17. Plaintiff also claims that "the inquiry by the office of Representative Conyers, pressured CMS approval for a CT Scan of [his] neck and chest, on June 29, 2004 at War Memorial hospital in Ste Saint Marie, MI." Doc. Ent. 1 at 20 ¶ 23.

In the JCF portion of Plaintiff's complaint (¶¶ 26-101), Plaintiff states that he "had heard about CMS, who does what they do through their doctors, but [he] never comprehended how they go about administering sub-standard treatment. My last doctor interaction involved minor things and when I filed my suit in 1997, doctors were not CMS; there is a gulf wide disparity. You hear about CMS doctors doing this or that, but–just like Cancer–you never pay attention to it until it happens to you. After-the-fact, and after-the-damage." Doc. Ent. 1 at 43 ¶ 62. Plaintiff also claims that his "rebellion, against being the subject of inhumane treatment, has given me the strength to persevere through the obstacles and hurdles CMS medical personnel have placed in my path with their repeated malfeasant actions." Doc. Ent. 1-2 at 2 ¶ 73. Plaintiff also states that it was from the office of the Step III grievance respondent "that CMS was hired by the MDOC and I am showing through my grievances that everything you've read and heard about CMS—is true[.]" Doc. Ent. 1-2 at 44, 46 ¶ 99. According to Plaintiff, "every time it benefits them, they cannot find something." Doc. Ent. 102 at 46 ¶ 99.

Finally, in the JMF portion of Plaintiff's complaint (¶¶ 102-154), Plaintiff claims that "prison medical care via CMS has preemptively altered the course of my life, but ensuring my days are filled with worry and anxiety and concern for my family should things go – wrong." Plaintiff claims that "[i]t would have been a dream to sit back and let the chemotherapy do its work. But [he] ha[s] never had that luxury for as long as [he] ha[s] been under out-patient CMS provided prison medical care." Doc. Ent. 1-3 at 49 ¶ 128. Plaintiff also claims that "CMS Coordinator Michael Stuperak and Nurse Supervisor Terry Arnold placed the blame for me not receiving the Methotrexate on the CMS contracted PharmCorr." Doc. Ent. 1-3 at 49 ¶ 129.[14] Plaintiff claims that "CMS doctors know that the most that will be done to him for this intentional, malicious and criminal act, will be a transfer to a different prison." Doc. Ent. 1-4 at 30 ¶ 154.

Citing *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994)[15] and *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the CMS Defendants claim that "CMS, acting as an agent of the State, is not liable under the theory of *respondeat superior*." Doc. Ent. 76 at 4 ¶ 17. Citing *Garner v. Memphis Police Department*, 8 F.3d 358, 364 (6th Cir. 1993),[16] the CMS Defendants contend that "[a]s a corporation, [Defendant CMS] can only be held

[14]Methotrexate is "[a] chemical substance used as an antineoplastic (to treat cancer). It is also used as an immunosuppressive agent (to diminish or check the immunological response to the body when that is desirable)." SCHMIDT'S ATTORNEYS' DICTIONARY OF MEDICINE, VOLUME 3, M-169 (1995). It appears that Antonini prescribed Methotrexate for Plaintiff on March 28, 2005. Doc. Ent. 1 at 42.

[15]"Municipal liability for the actions of employees may not be based on a theory of *respondeat superior*." *Berry v. City of Detroit*, 25 F.3d 1342, 1345 (6th Cir. 1994).

[16]"[T]o satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner*, 8 F.3d at 364 (quoting *Coogan v. City of Wixom*, 820 F.2d 170, 176 (6th Cir.1987)). It should be noted that "in *Coogan* [the Sixth Circuit] held that '[a]n action for damages under § 1983 based on a claim of malicious prosecution is properly dismissed when the plaintiff fails

liable under 42 U.S.C. § 1983 if Plaintiff alleges a policy or procedure of [Defendant CMS] violated Plaintiff's Constitutional Rights." Doc. Ent. 76 at 4 ¶ 18. The CMS Defendants argue that because "[p]laintiff has failed to claim that a specific policy, practice or procedure was in place through CMS that caused deliberate indifference to Plaintiff's civil rights, Plaintiff has no claim to bring under this matter." Doc. Ent. 76 at 4 ¶ 19.

Relying upon *Monell*, 436 U.S. at 691, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999),[17] and *Garner*, 8 F.3d at 364, the CMS Defendants claim that "[p]laintiff has failed to state a claim as to any Eighth Amendment violation as to [Defendant CMS]." First, the CMS Defendants argue that Defendant CMS "cannot be held liable under 42 U.S.C. § 1983 based upon a theory of *respondeat superior*." It is their opinion that "even if an individual CMS staff member did act inappropriately, which is not the case, there can be no liability to CMS on those grounds alone." Second, the CMS Defendants argue that "[p]laintiff has failed to allege specific facts to demonstrate that CMS has been deliberately indifferent in any fashion, much less that CMS has a policy that violated Plaintiff's Constitutional rights." According to the CMS Defendants, "[p]laintiff has cited no specific policy or procedure of CMS which allegedly violated his civil rights. Furthermore, [he] has not alleged any specific facts regarding any policy or procedure of CMS which allegedly violates his civil rights. Moreover, activities of the State health care employees at the correctional facilities in which Plaintiff has been incarcerated cannot be attributed to [Defendant CMS]." Therefore, they

---

to show that all the elements of the charge under state law are present.' We note, however, that *Coogan* was decided prior to *Albright [v. Oliver*, 510 U.S. 266 (1994)] and is no longer good law." *Frantz v. Village of Bradford*, 245 F.3d 869, 874 (6th Cir. 2001), *declined to follow on other grounds, Thacker v. City of Columbus*, 328 F.3d 244, 258 (6th Cir. 2003).

[17]"[L]iability under § 1983 must be based on active unconstitutional behavior and cannot be based upon 'a mere failure to act.'" *Shehee*, 199 F.3d at 300 (citing *Salehpour v. University of Tennessee*, 159 F.3d 199, 206 (6th Cir.1998)).

conclude, "there is nothing in [the] Complaint that sets forth the substance of a claim concerning a specific CMS policy that, when executed, resulted in a violation of Plaintiff's civil rights pursuant to 42 U.S.C. § 1983." Doc. Ent. 76 at 23.

As Plaintiff observes, "[a]lthough not authorized by written law, such practices of state officials could well be so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167-168 (1970). Plaintiff contends that "without discovery, [he] cannot state whether or not Defendant Westover's decisions were based upon a 'policy' of CMS." Plaintiff claims "[i]t would be much easier to show . . . some documents pertinent to showing a 'custom' of CMS." He contends he will need "evidentiary support to show – a custom of CMS 'that has not been formally approved by an appropriate decision-maker,' but that is so widespread as to have the force of law." Doc. Ent. 101 at 5 (citing *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997)). Furthermore, Plaintiff states that he too "would be better prepared to defend a Rule 56 motion from [the CMS Defendants], especially their claims under *Monell*." Doc. Ent. 101 at 5-6.

With respect to the Civil Rights Act of 1871, the Supreme Court has stated that "[l]ocal governing bodies . . . can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978) (internal footnote omitted). "Moreover, . . . local governments, like every other § 1983 'person,' by the very terms of the statute, may be sued for constitutional deprivations visited pursuant to

governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell*, 436 U.S. at 691.

With respect to 42 U.S.C. § 1983, the Supreme Court has stated that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. "[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Id*. "[T]he mere right to control without any control or direction having been exercised and without any failure to supervise is not enough to support § 1983 liability." *Monell*, 436 U.S. at 694 n.58, citing *Rizzo v. Goode*, 423 U.S. 362, 370-371 (1976). "[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell*, 436 U.S. at 694.

A private entity employed by the state to provide medical services to its prison inmates may be sued under §1983 as one acting "under color of state law." *West v. Atkins*, 487 U.S. 42, 54 (1988). Defendant CMS, however, cannot be held vicariously liable under 42 U.S.C. §1983 for the conduct of its agents on the basis of *respondeat superior*. "CMS, although clearly a state actor and therefore a proper party to this § 1983 action, cannot be held vicariously liable for the actions of its agents, []on a respondeat superior basis. Hence, CMS's liability must also be premised on some policy that caused a deprivation of [Plaintiff's] Eighth Amendment rights." *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed.Appx. 459, 465 (6th Cir. 2001) (internal citation omitted) (on appeal from entry of summary judgment for defendants). *See also Cooper v. Shelby County Justice Center*,

26

No. 99-6365, 2000 WL 924604, **2 (6th Cir. June 26, 2000) (unpublished) ("Cooper's claims against Shelby County, the City of Memphis, CMS, Gilless, Rodgers, and Harper are frivolous because they are based upon a respondeat superior theory of liability, which cannot provide the basis for liability in § 1983 actions."); *Street v. Corrections Corporation of America*, 102 F.3d 810, 818 (6th Cir. 1996); *Holmes v. Overton*, No. 5:03-CV-88, 2006 WL 2795459, *5 (W.D. Mich. Sept. 27, 2006) (Edgar, J. adopting and accepting report and recommendation of Greeley, M.J.).

Considering that Plaintiff's *pro se* complaint is held to a less stringent standard than complaints drafted by lawyers, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), Defendant CMS is not entitled to dismissal on the basis that Plaintiff has failed to state a claim. First, Plaintiff's claim against Defendant CMS appears to be based upon a policy or practice of choosing cost savings over care. To begin, Plaintiff claims the CMS Defendants missed his allegations about CMS. Plaintiff claims that Westover "made a decision that impacted diagnostic testing because he did not feel CMS would approve additional testing based upon cost." Doc. Ent. 101 at 2. In support of this claim, he points to Paragraph 17 of his complaint, wherein he stated that Westover "did not believe CMS would approve any further testing." Doc. Ent. 1 at 13 ¶ 17. Plaintiff claims that "[w]hat is not known, at this point, is whether he made that statement about CMS because of a 'policy' or a 'custom'." Doc. Ent. 101 at 2. *See Holmes v. Overton*, 2006 WL 2795459, *5 (W. D. Mich. Sept. 27, 2006) (accepting and adopting report and recommendation and denying defendants' motion for summary judgment, "because plaintiff has shown that there was a policy that gave economic incentive to deny medical care, a question of fact exists in this case whether CMS should be liable."). Furthermore, while Plaintiff generically refers to "Health Care Professionals," he claims that "[t]he basis of every decision is economic." Doc. Ent. 1-2 at 11 ¶ 79. Plaintiff claims

27

that "[a]t JCF they have an agenda that includes, the aphorism 'less is more' and it is often to the peril of sick prisoners." Doc. Ent. 1-2 at 44 ¶ 97. Also, Plaintiff claims that Antonini was sent to JMF "to show these doctors how to save money by discarding prisoner medical concerns[,] and they are acting in accord." Doc. Ent. 1-4 at 30 ¶ 154.

Second, Plaintiff is alleging a pattern of problematic dispensation of his prescribed medicine. Specifically, he asserts that in three cases his chemotherapy medication was "not provided as prescribed." Doc. Ent. 1-2 at 30 ¶ 91.[18] Within his complaint, Plaintiff refers to the July 7, 2004 "First Report on Medical Services" by Robert L. Cohen, M.D., in *Hadix v. Johnson*. Doc. Ent. 1-2 at 36 ¶ 91(a). The first six pages of this report were attached to Plaintiff's March 13, 2008 response to the MDOC Defendants' November 29, 2007 dispositive motion. Doc. Ent. 56 at 13-18.[19] In his complaint, Plaintiff represents that page 16 of the report states, "[t]he *Hadix* facilities are not committed to providing medications the same day they are ordered. This policy is supposed to apply to patients seen at specialty clinics. . . This system regularly fails." Doc. Ent. 1-2 at 36 ¶ 91(a).

To the extent Plaintiff's allegations regarding policies and/or customs of CMS need refinement, they can be substantiated during discovery. For example, in *Petty v. County of Franklin, Ohio*, 478 F.3d 341 (6th Cir. 2007), the Court considered "whether or not Petty's complaint properly

[18]According to Plaintiff, "November 19, 2004 was the first instance where MDOC Medical staff interfe[r]ed with the prescribed Treatment Plan . . . by not filling the prescription for Prednisone until November 24, 2004." Doc. Ent. 1 ¶ 43. February 10-13, 2005 was the second time his prescription for Prednisone had not been filled. Doc. Ent. 1-2 at 4 ¶ 76; Doc. Ent. 1-2 at 6. According to Plaintiff, July 8-11, 2005 was the third instance of his chemotherapy medication not being provided as prescribed. Doc. Ent. 1-2 ¶ 91; Doc. Ent. 1-2 at 31.

[19]On July 16, 2008, Plaintiff requested that the Court take judicial notice of this report in conjunction with his response to Defendant Glasper's dispositive motion. Doc. Ent. 83. Counsel for the MDOC Defendants filed a response to this request on October 1, 2008. Doc. Ent. 92. In fact, in their objections to the report and recommendation, the MDOC defendants take issue with Magistrate Judge Komives's reliance upon this document. Doc. Ent. 91 at 10-11, 19-20.

states a claim for municipal liability under *Monell* and *Tuttle*." *Petty*, 478 F.3d at 347.  Petty's claim

of "Municipal Liability" contained the following paragraph:

> Said acts by the individual Defendants County, Franklin County Sheriff's
> Department, Jim Karnes, John Doe # 1 and John Doe # 2, were proximately caused
> by certain customs and policies of Defendants County, Franklin County Sheriff's
> Department and Karnes, including but not limited to, a failure to adequately and
> reasonably train, supervise and discipline officers in such a way to properly protect
> the constitutional rights of citizens; and a specific set of policies established during
> the days of the incidents described above, which had the effect of permitting,
> encouraging, approving and ratifying violations of the constitutional rights of
> citizens, including Plaintif[f], as described above.

*Petty*, 478 F.3d at 347-348.  Although the Court ultimately found that "Petty [was] unable to survive

summary judgment with respect to his claims against the County[,]" the Court was "not convinced

that the district court was correct in dismissing Petty's municipal-liability claim at the 12(b)(6)

stage." *Id*. at 348.  As the Court observed, "[w]e wonder how Petty would necessarily know, at the

point of his complaint, and without the benefit of discovery, whether such a custom or policy might

exist, and if it does exist, what its contours might be or how exactly it effected a violation of his

constitutional rights."

For these reasons, this Court concludes that Plaintiff's claims against CMS are not based

upon *respondeat superior*, but, rather, are based upon a policy or practice of choosing cost savings

over care and a pattern of problematic dispensation of his prescribed medicine.

## V.   CONCLUSION

Consistent with the foregoing opinion,

**IT IS ORDERED** that the CMS Defendants' Fed. R. Civ. P. 12(b)(6) Motion to Dismiss

**[Docket No. 76, filed May 29, 2008]** is **GRANTED** to the extent it seeks dismissal of

Defendant Westover, only, for failure to state a claim; however, it is **DENIED** in all other respects, as to all other Defendants.

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated:  March 30, 2009

     I hereby certify that a copy of the foregoing document was served upon Andre Davis, Reg. No. 198028, Muskegon Correctional Facility, 2400 S. Sheridan Rd., Muskegon, MI 49442 and counsel of record on March 30, 2009, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager